Richard FELTROP, Respondent,

v.

ESKENS DRYWALL AND INSULATION,
Appellant,

Liberty Mutual Insurance
Company, Appellant,

Treasurer of the State of Missouri as
Custodian of the Second Injury
Fund, Respondent.

No. WD 53708.

Missouri Court of Appeals,
Western District.

Nov. 4, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 23, 1997.

John F. Sander, Riethmann, Valentine and Rouse, St. Louis, for Eskens Drywall and Liberty Mutual, appellant.

William Brandecker, Brandecker & Smull, Columbia, for respondent.

Before SMART, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Appellant Liberty Mutual Insurance Company appeals the decision of the Labor and Industrial Relations Commission awarding workers' compensation benefits to Richard Feltrop. It contends that it is not responsible for such benefits because Mr. Feltrop was not disabled, as that term is used in the workers' compensation statutes, in that he did not miss work as a result of his injuries. We reject this argument, and hold that where, as here, the employee has been diagnosed with a work-related occupational disease which limited his earning capacity because it limited his ability to perform certain work, he is disabled under the statute despite the fact that he has managed to find a way to continue working despite the injury.

Liberty Mutual also argues that, because Mr. Feltrop was diagnosed with an occupational disease before it provided insurance coverage for Mr. Feltrop's employer, it is not liable for workers' compensation benefits. Because Mr. Feltrop continued to perform the injury-causing work after Liberty Mutual began to provide coverage to Mr. Feltrop's employer, and up until the time he filed his claim, we find that Liberty Mutual is

liable for Mr. Feltrop's workers' compensation benefits.

We also reject Liberty's argument that the award was erroneously based on an inadmissible medical expert's opinion given in response to a defective hypothetical question because Liberty Mutual has failed to preserve this point for appeal. Finally, we reject Liberty's claim that the Commission erred in finding that Mr. Feltrop sustained his burden of showing a causal relationship between his medical bills and his work-related injuries. For these reasons, the decision of the Commission is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Richard Lee Feltrop began working at Eskens Drywall and Insulation ("Eskens") in 1971. His duties included installing and finishing sheetrock, which involved working with his arms over his head much of the time while making repetitive motions. In 1979, Mr. Feltrop left Eskens and started his own business. From approximately 1980 to 1984, Mr. Feltrop was self-employed. In 1981, during the time he was self-employed, Mr. Feltrop went to see Dr. Joseph Kayser, a chiropractor, because he was having trouble sleeping due to back aches. He returned to work for Eskens in 1985, working primarily in a supervisory capacity, but continuing to do some physical labor such as installing and finishing sheetrock.

Mr. Feltrop developed a "burning, tingling, crawling" pain in his neck and shoulders. He also testified that his wrists got numb and tingled. Mr. Feltrop testified that real problems from the pain began in approximately 1991 or 1992. After that time, Mr. Feltrop had to decrease the amount of time he spent doing the physical aspects of his job because working over his head to hang and finish drywall was causing him too much pain. He testified that he spent about sixty hours per year hanging sheetrock and ten hours per week finishing it. The remainder of his time was spent estimating and coordinating Eskens' work.

### A. Insurance Coverage

Liberty Mutual began providing insurance coverage for Eskens on September 1, 1992. Liberty Mutual asserts that Mr. Feltrop was diagnosed with herniated cervical disks and carpal tunnel syndrome before this date and, therefore, it is not liable to Mr. Feltrop for compensation. Instead, Liberty Mutual claims that Eskens' prior insurer, who provided coverage at the time of Mr. Feltrop's diagnosis, is liable for any workers' compensation benefits to which Mr. Feltrop may be entitled.

### B. Treatment for Neck Pain.

Mr. Feltrop sought medical attention for his neck pain on January 24, 1992. On that date, he saw Dr. Curtis Cox in Jefferson City. Dr. Cox ordered an MRI to be done to help him evaluate the problem. Four days later, on January 28, 1992, Mr. Feltrop returned to see Dr. Cox and to discuss the results of the MRI. At that time, Dr. Cox diagnosed Mr. Feltrop as having a herniation in his spine and prescribed cervical traction. After one month of cervical traction, on February 25, 1992, Dr. Cox saw Mr. Feltrop again and diagnosed him as having "stenosis from bulging discs and cervical spondylosis." Dr. Cox recommended surgery if Mr. Feltrop's symptoms persisted.

Because Mr. Feltrop wanted a second opinion, he saw Dr. Joel T. Jeffries at Columbia Orthopaedic Group almost a year later on February 16, 1993. Dr. Jeffries' notes indicate that he reviewed the January 1992 MRI and concluded that Mr. Feltrop had "degenerative disc disease of [the] cervical spine." Dr. Jeffries' records indicate that a copy of this diagnosis was mailed to Eskens, because it was Mr. Feltrop's employer. This is the earliest indication in the record that a physician believed Mr. Feltrop's neck and shoulder pain were work-related. In addition, Mr. Feltrop testified that Dr. Jeffries told him that his injury was work-related at the time the doctor looked at an MRI and asked Mr. Feltrop what his job details were. This corresponds with what occurred on Mr. Feltrop's February 16, 1993, visit to Dr. Jeffries. Mr. Feltrop further testified that Dr. Jeffries' office called Eskens at that time. Dr.

Jeffries conducted several follow-up examinations of Mr. Feltrop on March 24, 1993, April 28, 1993, August 5, 1993, and February 22, 1994.[1] Dr. Jeffries also sent Mr. Feltrop for treatment at St. Mary's Health Center in March 1993.

### C. Treatment for Wrist Pain.

Mr. Feltrop sought medical attention for his wrist pain on May 13, 1992, when he saw Dr. Roger Cameron of the Jefferson City Bone and Joint Clinic, Inc. Dr. Cameron's records of that visit state, "HISTORY BY PATIENT: Onset one year. Carpal tunnel syndrome due to type of work patient does." The notes also concluded that it was possible Mr. Feltrop had early carpal tunnel syndrome and he was, therefore, referred to a specialist, Dr. A.M. Hooshmand. Dr. Cameron's records elsewhere indicate that on May 27, 1992, he spoke with an employee of Eskens and was told that they had sent a report of injury on May 22, 1992. The records also indicate that, on that same day, Dr. Cameron left a message for Ms. Ruth McAtee at American States Insurance, which was Eskens' insurer at that time, to call his office. Dr. Cameron's notes for May 28, 1992, state that Ms. McAtee at American States had not yet received the information she needed from Eskens. The note further states that Mr. Feltrop was notified of this and he was going to discuss it with a secretary at Eskens that day.

On August 4, 1992, Dr. Hooshmand sent a letter to Dr. Cameron in which Dr. Hooshmand diagnosed Mr. Feltrop as having the early stages of bilateral carpal tunnel syndrome. The letter states that Mr. Feltrop indicated that the pain in his wrists decreased as he decreased the amount of physical labor he did. Although the letter did not unequivocally state that Mr. Feltrop's carpal tunnel syndrome is due to his work at Eskens, the letter did state that Mr. Feltrop did not need surgery "considering the fact that he mostly does bid on the job and doesn't get involved with the manual aspects of his work as he use [sic] to do in the past." The record

also includes a letter written by Dr. Cameron, dated September 22, 1992, and addressed "TO WHOM IT MAY CONCERN." This letter unequivocally stated that Mr. Feltrop's carpal tunnel syndrome "is related to the type of sanding and finishing work he does with his hands that has caused his symptoms."

### D. Filing of Injury Claims.

On December 9, 1993, Mr. Feltrop filed a Claim for Compensation against Eskens and Liberty Mutual for the injuries to his wrists and his neck. The Claim alleged that using his arms, hands, wrists, neck, and shoulders repetitively as a drywall finisher had caused permanent injury in the form of carpal tunnel syndrome, cervical disc protrusion, and tennis elbow. An amended claim was filed on May 10, 1994, adding a claim against the Second Injury Fund for permanent partial disability. On May 11, 1994, Mr. Feltrop filed a second Claim for Compensation against Eskens and American States Insurance for similar injuries.

The ALJ held a hearing on January 4, 1996. On February 27, 1996, the ALJ issued *Findings of Fact* stating that Mr. Feltrop had sustained an occupational disease or accident as a result of repetitive motion arising out of and in the course of his employment. The ALJ found that both Mr. Feltrop's neck and wrist injuries were diagnosed as being work-related during Liberty's coverage and, therefore, held Liberty Mutual liable. In particular, the ALJ held that Mr. Feltrop learned of the work-relatedness of his neck injury from Dr. Jeffries in February 1993, long after Liberty Mutual began coverage on September 1, 1992. As to the wrist injury, the ALJ stated, "Medical records of the Bone and Joint Clinic reveal a diagnosis of work-related carpal tunnel syndrome in September 1992 when Dr. Cameron writes that 'it is my impression that this is related to the type of sanding and finishing work that he [Mr. Feltrop] does with his hands that has caused his symptoms.'" The ALJ concluded that Mr. Feltrop had "a permanent disability of 12

---

**1.** Mr. Feltrop also saw Dr. Jeffries on at least one other occasion, but this visit was for an injury to

his knee that is not at issue in these proceedings.

and½ percent of the body referable to the neck and 10 percent of each hand at the wrist." Therefore, the ALJ awarded Mr. Feltrop $11,780.50 for his neck injury and $8,246.36 for both wrists, for a total lump sum of $20,026.86 for permanent partial disability against Eskens and its insurer, Liberty Mutual.

In addition, the ALJ determined that Eskens was aware of the fact that Mr. Feltrop's neck injury was work-related after February 16, 1993. Because Eskens offered no medical treatment, the ALJ held Eskens was liable for the treatment Mr. Feltrop sought on his own after this date. Therefore, the ALJ added the bills for Mr. Feltrop's follow-up visits to Dr. Jeffries on March 24, 1993, April 28, 1993, February 22, 1994, and the treatment at St. Mary's Health Center in March 1993,[2] and awarded Mr. Feltrop $935.70 for medical aid. All of the parties filed applications for review by the Labor and Industrial Relations Commission. The Commission affirmed, and this appeal followed.

## II. STANDARD OF REVIEW

■■■ Our review in a workers' compensation case is limited. We can reverse, remand, or modify only if the Labor and Industrial Relations Commission acted in excess of its powers, the award was procured by fraud, the facts found by the Commission do not support the award, or there was not sufficient competent evidence to support the award. § 287.495.1, RSMo 1994. We conduct an independent review of questions of law. *Johnson v. Denton Constr. Co.*, 911 S.W.2d 286, 287 (Mo. banc 1995); *Mayfield v. Brown Shoe Co.*, 941 S.W.2d 31, 34 (Mo.App.1997).

We review the entire record, including all legitimate inferences drawn therefrom, in the light most favorable to the Commission's findings, *Wright v. Sports Associated, Inc.*, 887 S.W.2d 596, 598 (Mo. banc 1994), and must affirm the Commission's decision if it was supported by competent and substantial evidence, *Johnson*, 911 S.W.2d at 288. On issues involving witness credibility and the weight to be given to testimony, we defer to the Commission. *Johnson*, 911 S.W.2d at 288.

## III. MR. FELTROP WAS NOT REQUIRED TO MISS WORK IN ORDER TO BE DISABLED UNDER THE WORKERS' COMPENSATION STATUTES

As its second point on appeal, Liberty Mutual claims that the Commission erred in finding Mr. Feltrop permanently partially disabled to any degree as a result of his carpal tunnel syndrome and neck injury because there is no evidence in the record that Mr. Feltrop missed work due to those repetitive stress injuries. Liberty Mutual claims that until time from work is missed, there is no disability from performing the employment and hence no compensable injury.

In support, Liberty Mutual cites to cases which do contain language stating that an occupational disease becomes a compensable injury when the employee becomes incapacitated from work. Each of these statements is *dictum*, however, for in each case the employee did miss work. That point thus became the logical one from which to measure the employee's disability.[3]

None of the cases cited by Liberty Mutual addresses whether an injury can be disabling

---

2. For an unknown reason, the ALJ did not include Mr. Feltrop's visit to Dr. Jeffries on August 5, 1993, in awarding medical expenses.

3. For example, in *Simmerly v. Bailey Corp.*, 890 S.W.2d 12 (Mo.App.1994), the Southern District of this Court was concerned with which of two insurers was liable for the employee's carpal tunnel syndrome. It determined that the insurer who provided coverage when the employee first missed work was liable. In reliance on *Simmerly*, *Lococo v. Hornberger Elec., Inc.*, 914 S.W.2d 67 (Mo.App.1996), held that the insurer who provided coverage on the date when the employee was unable to work was liable, stating,

"Where the issue for determination is which of two successive insurers is responsible for the employee's claim, courts look to the insurer providing coverage at the time the employee was last exposed to the hazard before becoming disabled, or incapacitated from work." *Id.* at 69. *See also Oberg v. American Recreational Products*, 916 S.W.2d 304 (Mo.App.1995) (stating, "the insurer responsible for the employee's claim was the one with coverage when the employee was last exposed *before disability*," which the court found occurred when the employee lost time from work).

if the employee does not miss work but is diagnosed with a debilitating injury which is work-related. We note, however, that at least two other cases *have* permitted recovery by an employee who otherwise proved disability, without any evidence that the employee missed work as a result of the disability. All that was required was that a claim be made for an injury which was diagnosed to be work-related and to otherwise meet the relevant statutory requirements. *See Johnson,* 911 S.W.2d at 287; *Anderson v. Noel T. Adams Ambulance District, Adair County Ambulance District,* 931 S.W.2d 850, 852–53 (Mo.App.1996). While this was not a focus of the court's opinion in those cases, it was the focus of this Court's very recent opinion in *Coloney v. Accurate Superior Scale Co.,* 952 S.W.2d 755 (Mo.App. W.D.1997), and *Coloney* resolved this issue in a manner contrary to that argued for by Liberty Mutual. *Coloney* holds that an injury is compensable if the employee has been diagnosed with a work-related disabling occupational disease, such as carpal tunnel syndrome, which limits his earning capacity because it limits his ability to perform certain work functions. This is true even if the employee has not yet actually missed work, for an employee can be incapable of performing certain tasks but can still be able to perform other tasks.

Such a scenario is particularly likely to occur where the injury suffered is an occupational disease such as carpal tunnel syndrome. Unlike sudden injuries, which are likely to result in an immediate loss of time at work while the employee is taken to the emergency room or physician, occupational diseases are progressive in nature. They develop and worsen over time. A diligent employee who has such an injury may be able to continue working by simply suffering through the pain or by developing coping techniques. Yet, eventually, the disease will reach a degree of severity which will prevent the employee from performing certain tasks or will limit the time the employee can perform those tasks.

Indeed, the record in this case provides a good example of the type of situation in which an award may be proper despite the lack of a loss of time from work. Here, the evidence shows that Mr. Feltrop suffered a disabling, work-related injury due to carpal tunnel syndrome and neck injury which caused him significant pain when he tried to hang or finish sheetrock or to perform similar over-the-head work activities. This disability would prevent him from installing and finishing sheetrock for a substantial period of time, as he had previously done. Because Mr. Feltrop was now in a position which required him to perform substantial administrative and supervisory work, however, he was already limiting the amount of his physical labor and was in a position to further limit it and to control the timing of these duties. In effect, he could put himself on "light duty" and thus avoid the need to miss work.

Mr. Feltrop should not be punished for this diligence by denying him recovery for his clearly existing disability. Moreover, to use the date that an employee first misses time from work as the date that he becomes disabled would create practical problems in the workplace. Such a rule would create an incentive for employees to miss work, even though they are capable of some alternative work activities, in order to trigger any claim they may have to recover workers' compensation benefits. On the other hand, diligent employees who stay at work would be punished because a court might later determine that they suffered no disability and were not entitled to workers' compensation benefits. For these reasons, as well as for the additional reasons stated in *Coloney,* we apply the rule set out in *Coloney* that, whether or not the employee misses work, if the injury is shown to have harmed the employee's earning capacity, it is enough to constitute a disability under the workers' compensation statutes. We, therefore, affirm the ruling below that Mr. Feltrop may recover without proof that he lost time at work because of his injuries.

*IV. LIBERTY MUTUAL IS THE LIABLE INSURER BECAUSE IT PROVIDED INSURANCE COVERAGE WHEN MR. FELTROP WAS LAST EXPOSED TO THE HAZARDOUS CONDITIONS PRIOR TO FILING HIS CLAIM*

Liberty Mutual also asserts that, even if Mr. Feltrop is entitled to benefits, it is not

Liberty Mutual but rather Eskens' prior insurer, American States, which is liable for those benefits. In support, Liberty Mutual argues that prior to the date it began to provide coverage on September 1, 1992, Mr. Feltrop had already suffered his injuries, the doctors had at least tentatively diagnosed them, and Mr. Feltrop knew or should have known that those injuries were related to his drywall work for Eskens. It says that this was sufficient to trigger a coverage obligation on the part of Eskens' prior insurer.

■ We agree with Liberty Mutual insofar as its argument implies that coverage could not have been triggered until Mr. Feltrop was diagnosed with a compensable disability, for until this diagnosis he had no basis to file a claim where, as here, he was able to work through or around his injuries and thus did not miss any days from work. We disagree, however, that the date of diagnosis is the sole basis for determining which insurer is liable for coverage.

The employer responsible for coverage is determined by Section 287.063.2, which provides:

> The employer liable for the compensation in this section provided shall be the employer in whose employment the employee was last exposed to the hazard of the occupational disease *for which claim is made* regardless of the length of time of such last exposure.

§ 287.063.2, RSMo Cum.Supp.1993 (emphasis added). The rule set out in this statute has been termed the "last exposure" rule. Reference to the employer in the statute also refers to the employer's insurer. § 287.030.2, RSMo Cum.Supp.1993. Thus, cases analyzing how to determine which employer is liable for compensation under the last exposure rule also govern how to determine which insurer is liable where the employee has continued to work for the same employer but the employer has changed its insurer sometime after the occupational disease process began.

In *Johnson*, 911 S.W.2d at 287, the Missouri Supreme Court rejected both the argument that the last exposure rule automatically imposes liability on the employer in whose employ the employee was last exposed to the hazard prior to diagnosis and the argument that the last exposure rule automatically imposes liability on the employer in whose employ the employee was last *ever* exposed to the hazard. Rather, the Supreme Court stated:

> In order to determine the employer liable for a particular occupational disease, it is *first* necessary to evaluate the nature of the claim at issue.
>
> ... The starting point in applying the last exposure rule is that the employer liable for compensation is *the last employer to expose the employee to the occupational hazard prior to the filing of the claim.*

*Johnson*, 911 S.W.2d at 288 (emphasis added).

Thus, in our case, the first issue we must determine is which insurer provided coverage at the time Mr. Feltrop was last exposed to the occupational hazard before he filed his claim. In regard to both Mr. Feltrop's neck injury and his wrist injury, this insurer was Liberty Mutual.

Specifically, while Mr. Feltrop suffered neck pain prior to the time Liberty Mutual began to provide coverage on September 1, 1992, the first diagnosis of a work-related neck injury occurred on February 16, 1993, when Dr. Jeffries told Mr. Feltrop that his neck and shoulder pain were work-related after looking at an MRI and asking Mr. Feltrop what his job details were. Mr. Feltrop did not file his claim for this injury until December 9, 1993. Mr. Feltrop continued to be exposed to the hazard of the occupational disease—that is, he continued to hang and finish drywall—throughout this period. Liberty Mutual provided coverage throughout this period. It is liable on Mr. Feltrop's workers' compensation claim for his neck injury under the last exposure rule.[4]

4. And, indeed, would be liable even if we determined liability based on last exposure prior to diagnosis or last exposure ever, the other two triggering events urged by Liberty Mutual or by insurers in other cases.

Mr. Feltrop also began to suffer wrist pain prior to the time Liberty Mutual began to provide coverage on September 1, 1992, and he was first diagnosed with carpal tunnel syndrome prior to that date, although the record is unclear whether he knew or should have known that he had work-related carpal tunnel syndrome prior to September 1, 1992.[5] We need not resolve the latter question, however, for, as just noted, the record shows that Mr. Feltrop continued to finish and hang drywall (although less often than he had previously done) after September 1, 1992, and that he did not file his claim for his wrist injury until December 9, 1993. Liberty Mutual provided coverage after September 1, 1992, and up through the time Mr. Feltrop filed his claim. Accordingly, under the rule set out in *Johnson*, it is liable for his injuries under the statute. On this basis we affirm the Commission's ruling.

## V. LIBERTY MUTUAL IS LIABLE FOR MR. FELTROP'S MEDICAL EXPENSES

Liberty Mutual further contends that the Commission erred in finding it liable for Mr. Feltrop's 1993 medical bills sustained in treating his neck injury because he did not sustain his burden of proving that he had a compensable injury and that there was a causal relationship between the bills and his work for Eskens.

▮ Of course, regardless of when Mr. Feltrop's injury first began, his employer had an obligation to provide medical care for his work-related injury. Section 287.140 provides:

In addition to all other compensation, the employee shall receive and the employer shall provide such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial, ambulance and medicines as may reasonably be required after the injury or disability, to cure and relieve the effects of the injury.

§ 287.140.1, RSMo Cum.Supp.1993. If an employer has notice that the employee needs medical treatment and fails to provide it as required by the statute, the employee can pick his own medical provider and the employer will be liable for those costs. *Blackwell v. Puritan–Bennett Corp.*, 901 S.W.2d 81, 85 (Mo.App.1995).

We have already found that Mr. Feltrop sustained a compensable injury to his neck and that Liberty Mutual provided coverage at the time that injury became compensable. Dr. Jeffries told Mr. Feltrop that his neck injury was work-related on February 16, 1993. A copy of this diagnosis was sent to Eskens, Dr. Jeffries' office called Eskens, and Mr. Feltrop told Mr. Eskens or his secretary that he was returning to Dr. Jeffries for further treatment. Mr. Feltrop saw Dr. Jeffries on several times after this for treatment of his neck injury. Dr. Jeffries also sent him for treatment at St. Mary's Health Center in March 1993. These were the dates for which the ALJ awarded Mr. Feltrop recovery.

▮ Eskens became aware of the work-related nature of the injuries before the time the medical bills in question were incurred. Yet, it did not offer to provide any medical treatment. Mr. Feltrop, therefore, was entitled to recover the costs of the medical treatment he obtained on his own, and the Commission's award of $935.70 to cover these costs was supported by substantial evidence.

## VI. HYPOTHETICAL QUESTION

Liberty Mutual also claims that the Commission erred in awarding Mr. Feltrop permanent partial disability benefits because that award was based on a defective hypothetical question asked of one of Mr. Feltrop's expert medical witnesses. During the

5. On May 13, 1992, Dr. Cameron tentatively diagnosed Mr. Feltrop as possibly suffering from carpal tunnel syndrome in his wrists, and a notice of some sort was sent to Eskens and its insurer. However, Dr. Cameron referred Mr. Feltrop to Dr. Hooshmand for a more definite diagnosis. Dr. Hooshmand examined Mr. Feltrop, and on August 4, 1992, Dr. Hooshmand sent a letter to Dr. Cameron diagnosing Mr. Feltrop as having the early stages of bilateral carpal tunnel syndrome. The record does not reveal whether Mr. Feltrop received a copy of this letter. It does show he learned of the diagnosis no later than September 22, 1992, when he received a letter from Dr. Cameron telling him that he suffered from carpal tunnel syndrome due to the sanding and finishing work he performed for Eskens.

deposition of Dr. Jerome Levy, Mr. Feltrop's counsel asked Dr. Levy a hypothetical question. On appeal, Liberty Mutual now argues that the hypothetical was defective because it required Dr. Levy to assume that Mr. Feltrop had worked over his head *every day* during the twenty-two year period prior to February 16, 1993, whereas it is admitted that he did not do so. Rather, the record supports only the finding that, while Mr. Feltrop had worked daily doing this work for many years, during the four or five years before the hearing he had spent only approximately ten hours per week finishing drywall and approximately sixty hours per year actually hanging sheet rock. Some weeks he would not do any drywall finishing and other weeks he would spend much of his time doing that type of work. Mr. Feltrop elsewhere estimated that from 1984 to 1990 he had spent twenty or thirty hours per week finishing drywall.

■ Liberty Mutual, however, has failed to preserve this issue for appeal. At Dr. Levy's deposition, Liberty Mutual's counsel *did not specifically object* that the hypothetical question was based on an inaccurate statement of how much Mr. Feltrop worked over his head. Rather, counsel made only a general objection that the hypothetical question was based on facts not in evidence "and which may not be in evidence at the time of the trial." He also objected that Dr. Levy was basing his opinion on hearsay statements in reports of other doctors. When the deposition was offered at the hearing, Liberty's counsel did not object that the deposition contained an opinion based on inaccurate facts in a hypothetical question. Instead, counsel only renewed his objection that the deposition contained hearsay statements based on the reports of other doctors. At that point, the judge indicated that specific objections would be taken up at the conclusion of the hearing. There is no record in the transcript, however, of any later discussion regarding objections to Dr. Levy's deposition, whether based on hearsay or on an inaccurate hypothetical question. Therefore, Liberty Mutual has failed to preserve this point for appeal. *Johnson v. State*, 925 S.W.2d 834, 836 (Mo. banc 1996); *Bowman v.*

*McDonald's Corp.*, 916 S.W.2d 270, 276 (Mo. App.1995).

For these reasons, the judgment of the Commission is affirmed.

All concur.