William IRVING (Deceased), Appellant,

v.

**MISSOURI STATE TREASURER, Custodian of the Second Injury Fund, Respondent.**

**Derson Group, Ltd., Defendant.**

**No. WD 58579.**

Missouri Court of Appeals, Western District.

Nov. 14, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 26, 2000.

Application for Transfer Denied Feb. 13, 2001.

Jerrold Kenter, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Bruce E. Levine, Asst. Atty. Gen., Kansas City, for respondent.

Before Presiding Judge SMART, Judge ELLIS and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

Jane Irving–Genovese appeals the denial of her claim against Missouri's Second Injury Fund for death benefits under Section 287.220.5 RSMo 1991,[1] of the Worker's Compensation Act, in which she asserted that her husband's death resulted from heart problems caused by work-related stress. The Labor and Industrial Relations Commission denied her claim on the basis that she failed to meet her burden of proving her husband's death was job-related. Because competent and substantial evidence exists on the record to support the Commission's decision that Mr. Irving's death did not arise out of his employment, and because the decision is not against the overwhelming weight of the evidence, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

William Irving married Jane Irving–Genovese (hereinafter "Ms. Irving") on August 17, 1971. In the late 1980s, Mr. Irving worked for the Derson Group (hereinafter "Derson") as a "career out-placement specialist." His job responsibilities consisted of presenting seminars to unemployed individuals to assist them in finding employment. Mr. Irving aided them in preparing their resumes and provided them with suggestions on obtaining and performing well at future job interviews. He searched for job openings for these individuals and notified them of job fairs.

Beginning in the spring of 1988, and for the following eight months, Mr. Irving's

---

**1.** All statutory references are to RSMo 1991, the statute in effect when Mr. Irving died.

job responsibilities with Derson included performing out-placement counseling for 8,000 laid-off employees of Lockheed Aeronautics (hereinafter "Lockheed") in Atlanta, Georgia. Mr. Irving traveled from his home in Kansas City, Missouri, to Atlanta each work week. He usually flew home to Kansas City on Fridays and returned to Atlanta on Sundays. Although Mr. Irving had previously counseled smaller groups of "white-collar" unemployed individuals, in Atlanta he worked with "blue-collar" employees. The record does not reveal whether Derson had other counselors based in Atlanta or whether Derson brought in other counselors from Kansas City or elsewhere, nor does it reveal the total numbers of Derson employees. It does reveal that Ms. Irving visited her husband's workplace in Atlanta on one occasion and saw other persons similarly counseling employees, and that she assumed these persons also worked for Derson.

Ms. Irving claims that when her husband called her in the evenings from Atlanta he sounded "worn out," and that when he came home on the weekends, rather than relaxing he often worked. She contends that she noticed "a continuous grinding down" of her husband's appearance and his health. Prior to 1989, Mr. Irving developed adult-onset diabetes and also took medication for high blood pressure. On a Saturday evening in early 1989, Ms. Irving saw her husband gasping for breath. On February 6, 1989, Mr. Irving called Dr. James Stoddard, M.D., complaining of this shortness of breath. Mr. Irving saw Dr. Stoddard the next day. Dr. Stoddard's records reflect that Mr. Irving complained of anxiety and a continued shortness of breath that had lasted for two weeks. Mr. Irving's health began to deteriorate more severely and by February 1989 he no longer could travel to Atlanta.

Due to the effects of all of his health problems, Mr. Irving underwent a cardiac catheterization on March 6, 1989. Dr. Stoddard's records indicate that Mr. Irving was diagnosed with congestive heart failure. The records also noted that he suffered hypertension, diabetes, and hypercholesterolemia, and that his cholesterol level was 313. By April 1989, Derson fired Mr. Irving because he could no longer travel to Atlanta. Due to his health, Mr. Irving also could no longer work. He eventually applied for Social Security and received group disability benefits. Mr. Irving's health continued to decline, and on October 9, 1991, some 18 months after leaving Derson's employ, he died of arteriosclerotic heart disease.

Ms. Irving filed a worker's compensation claim against Derson, and learned that Derson did not have insurance covering Mr. Irving. She eventually settled her claim against Derson for $5,000. Ms. Irving then filed a claim for death benefits against Respondent, the Missouri Second Injury Fund, pursuant to Section 287.220.5, which states in pertinent part:

> If an employer fails to insure or self-insure as required in section 287.280, funds from the second injury fund may be withdrawn to cover the fair, reasonable, and necessary expenses to cure and relieve the effects of the injury or disability of an injured employee in the employ of an uninsured employer, funds from the second injury fund may be withdrawn to cover fair, reasonable, and necessary expenses in the manner required in sections 287.240 and 287.241.

Sec. 287.220. Ms. Irving contends that Mr. Irving's diabetes, congestive heart failure, and uncontrolled hypertension combined with his work-related stress caused his death, and that, as Derson was an uninsured employer, the Second Injury Fund is therefore liable for death benefits under Section 287.220.

Administrative Law Judge (ALJ) R. Carl Mueller, Jr. held a hearing on Ms. Irving's claim on October 26, 1999. Ms. Irving was the sole live witness. She testified about her husband's job, about her visit to his work in Atlanta, and about her

husband's prior health problems with diabetes and high blood pressure. She discussed the deterioration in his health after he began working in Atlanta. She said she saw the connection between his decline in health, the stress caused by his job, and his reasons for quitting work after he experienced shortness of breath and underwent the cardiac catherization.

Ms. Irving also presented the deposition testimony of Dr. Rory Childers, M.D., a specialist in cardiovascular disease. Dr. Childers based his opinions about Mr. Irving's health on medical records he reviewed after Mr. Irving's death. Dr. Childers verified that the records he examined could be reasonably relied on by cardiologists to form opinions about a patient's health, and testified about Mr. Irving's heart problems. Based on these records, a deposition taken of the deceased before his death, and a review of excerpts of other physicians' depositions, Dr. Childers testified, on cross-examination, and without objection, that Mr. Irving's diabetes never appeared to be controlled in any of the blood tests taken from 1984 until his death, and that Mr. Irving's high blood pressure also was poorly controlled. Dr. Childers concluded that prior to 1991, Mr. Irving suffered from cardiac failure as a result of inadequately controlled diabetes mellitus and hypertension, rather than as a result of his work at Derson. The Second Injury Fund relied on this testimony and did not present additional evidence.

On November 19, 1999, the ALJ issued an Award in which he denied all benefits to Ms. Irving. The ALJ found that Ms. Irving failed to establish that Derson had five employees, a prerequisite to Second Injury Fund liability under Section 287.030(3), which provides that employers "must have five or more employees to be deemed an employer for the purposes of this chapter." The ALJ further held that Mr. Irving's death did not arise out of the scope of his employment with Derson and that he was not acting within the course and scope of his employment at the time of his death.

Ms. Irving appealed this ruling to the Labor and Industrial Relations Commission. On April 14, 2000, the Commission affirmed the ALJ's decision. Ms. Irving now appeals to this Court.

## II. BURDEN OF PROOF AND STANDARD OF REVIEW

We review the Commission's decisions on questions of law *de novo*. *Davis v. Research Medical Center*, 903 S.W.2d 557, 561 (Mo.App. W.D. en banc 1995). Where, as here, it is claimed that the evidence was not sufficient to support the Commission's decision, we use a two-step analysis to review that decision. First, we examine the record in the light most favorable to the Commission's decision, disregarding evidence contrary to the Commission's decision, to determine whether the decision is supported by substantial and competent evidence. *Id.* at 565–66. If we find that the Commission's decision is supported by substantial and competent evidence, we then examine the record as a whole to determine whether the decision is contrary to the overwhelming weight of the evidence. *Id.* at 565. Where, as here, "the Commission affirms or adopts the findings and award made by the ALJ before whom the witnesses in the case testified in person, the resulting consistency, especially as concerns credibility determinations, is a powerful factor in favor of upholding the Commission's award on appeal." *Id.* at 571. *See also Feltrop v. Eskens Drywall and Insulation*, 957 S.W.2d 408, 412 (Mo.App. W.D.1997).

## III. LACK OF PROOF OF CAUSATION

Ms. Irving argues that the Commission erred in holding that she failed to prove that Mr. Irving suffered injury arising out of and in the course of his employment which caused his fatal heart disease, and which combined with his prior health conditions caused his death.

Ms. Irving argues that her proof was similar to that found sufficient in *Low v.*

*ACF Industries,* 772 S.W.2d 904 (Mo.App. E.D.1989). In *Low,* the employee suffered an under-lying heart condition and occasional chest flutterings and alleged that a heavier work load on the job caused him more stress and an increased number of chest flutterings. The court held that "there was evidence from which the commission could find that the job stress caused the rhythm of the heart beat to be disturbed," *id.* at 907, based on a doctor's deposition testimony that, during a period of severe occupational stress for the employee, he had "arrhythmias of the heart manifested by fluttering in the chest." *Id.* As such, the court found that there was sufficient, competent evidence to support the Commission's finding that the employee's heart problem was "directly and proximately caused by the work related stress endured by the employee." *Id.*

Ms. Irving contends that Mr. Irving suffered heart problems and work-related stress similar to that suffered by the employee in *Low,* and she should therefore receive compensation also. In support, she notes that she testified to the shortness of breath her husband suffered. She noted that he seemed fatigued while working in Atlanta for Derson. She testified that rather than relaxing, Mr. Irving worked on weekends, due to the great amount of stress he suffered, and that she observed a "grinding down" in her husband's appearance and health. While she admits she was the only witness to testify as to Mr. Irving's physical condition and the effect of his job on his health, she argues that her testimony was uncontradicted and was arbitrarily ignored by the Commission.

 The Second Injury Fund argues that, while both Mr. Irving and the claimant in *Low* may have suffered from heart problems, the latter presented medical testimony connecting the health problems to the employee's work. By contrast, here, the only such connection was provided by Ms. Irving herself, a lay witness. The testimony of a lay witness "can constitute substantial evidence of the nature, cause, and extent of disability when the facts fall within the realm of lay understanding." *Landers v. Chrysler Corp.,* 963 S.W.2d 275, 279 (Mo.App. E.D.1997). But, medical causation of injuries which are "not within common knowledge or experience, must be established by scientific or medical evidence showing the cause and effect relationship between the complained of condition and the asserted cause." *Brundige v. Boehringer Ingelheim,* 812 S.W.2d 200, 202 (Mo.App. W.D.1991). *See also Selby v. Trans World Airlines,* 831 S.W.2d 221, 222 (Mo.App. W.D.1992).

In the case at bar, Ms. Irving provided only her lay opinion as to the cause of her husband's health problems. The only expert medical evidence offered was the testimony of Dr. Childers, who testified that Mr. Irving's death was caused by his diabetes and by heart disease that was poorly controlled over the years, rather than by the stress caused by his employment. Our analysis in a similar situation in *Knipp v. Nordyne,* 969 S.W.2d 236 (Mo.App. W.D. 1998), is applicable here. There, as here, there was more than one possible cause of the employee's injury and ultimate death. We held that when a medical condition is complex in nature or a complicated injury exists "that requires surgical intervention or other highly scientific technique for diagnosis, and particularly where there is a serious question of pre-existing disability and its extent, the proof of causation is not within the realm of lay understanding nor in the absence of expert opinion is the finding of causation within the competency of the administrative tribunal." *Id.* at 240. Similarly, in *Carter v. Jones Truck Lines, Inc.,* 943 S.W.2d 821 (Mo.App. S.D.1997), because various medical problems may have ignited the employee's ventricular arrhythmia, the claimant "was required to present expert opinion that, to a reasonable medical certainty, the actual triggering cause of the V-fib was job related or work related." *Id.* at 826. *See also*

*Griggs v. A.B. Chance Co.,* 503 S.W.2d 697, 704–705 (Mo.App.1973).

■ Here, as in *Knipp* and *Carter,* there were complex medical issues regarding the medical cause of Mr. Irving's death. Ms. Irving, as a lay person, was not competent to testify as to which of these medical problems caused his death, and the court did not err in finding she failed to meet her burden of proof that his work at Derson led to his death.

■ Moreover, even had Ms. Irving been competent to testify to the medical cause of her husband's death, her testimony was directly contradicted by that of Dr. Childers. Dr. Childers testified that Mr. Irving suffered from diabetes and hypertension and that both diseases were present in Mr. Irving's health records in 1984, nearly four years prior to Mr. Irving's job in Atlanta. The doctor stated that Mr. Irving also suffered from hypercholesteremia, a highly elevated cholesterol level. He testified that Mr. Irving's heart attack and ultimate death were a result of inadequately controlled high blood pressure and uncontrolled diabetes, and not the result of work-related causes.

It was up to the Commission to resolve this conflicting testimony, and it clearly resolved the conflict in favor of Dr. Childers. While Ms. Irving says the Commission had to give her testimony as to causation greater weight since it did not say she was not a credible witness, this is not the case. While the Commission could not arbitrarily ignore her testimony, it could chose to find Dr. Childers' testimony more accurate and persuasive on the medical questions at issue, for the Commission "is charged with passing on the credibility of all witnesses and may disbelieve testimony absent contradictory evidence and the acceptance or rejection of any lay or expert testimony may not be disturbed on review unless its acceptance or rejection is against the overwhelming weight of the evidence." *Fischer v. Archdiocese of St. Louis–Cardinal Ritter Institute,* 793 S.W.2d 195, 199

(Mo.App. E.D.1990). The Commission thus had the discretion to believe the doctor's testimony rather than Ms. Irving's, and was not required to believe Ms. Irving's opinion as to causation. *Wilson v. ANR Freight Systems, Inc.,* 892 S.W.2d 658, 662 (Mo.App. W.D.1994).

■ Ms. Irving argues the testimony by Dr. Childers should have been ignored because it was based on hearsay and lacked an adequate foundation pursuant to Section 490.065, which states in pertinent part:

1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

2. Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

4. If a reasonable foundation is laid, an expert may testify in terms of opinion or inference and give the reasons therefor without the use of hypothetical questions, unless the court believes the use of a hypothetical question will make the expert's opinion more understandable or of greater assistance to the jury due to the particular facts of the case.

Sec. 490.065 RSMo 1998.

As Ms. Irving admits, however, she is the one who introduced Dr. Childers' deposition testimony. She introduced the entire deposition, including the parts she now

alleges are without foundation. She thereby waived any objection to introduction of this testimony, as noted when a similar situation arose in *Johnson v. Moore*, 931 S.W.2d 191 (Mo.App. E.D.1996). At the trial in *Moore*, Ms. Moore failed to object when Mr. Johnson read excerpts of a deposition into evidence. During her own case, Ms. Moore read excerpts of the same deposition into evidence, including some of the same excerpts that were first read into the record by plaintiff. On appeal, Ms. Moore asserted that the trial court plainly erred in allowing Mr. Johnson to read excerpts of the deposition at trial without first finding that the person being deposed was unavailable. *Id.* at 195. The court held that a party "cannot complain on appeal of any alleged error in which, by his or her own conduct at trial he or she joined in or acquiesced to." *Id.* Further, a party "waives a challenge to the admission of evidence where that party offers similar evidence." *Id.* This reasoning applies here. Ms. Irving introduced the deposition, and allowed it to be read at trial without objection. She thereby waived any claim of error in regard to its admission.

 At oral argument, counsel for Ms. Irving recognized that she had waived her right to object to admission of this evidence, and in fact said that he wanted the Commission to hear it because he felt it was so weak that it undercut the Second Injury Fund's position. He then argued in this Court that he thought the evidence had so little reliability that the Commission erred in giving it any weight, as it was based in part on hearsay contained in depositions and deposition excerpts. We note that a similar argument was recently rejected by the majority of this Court in an en banc decision in *State v. Butler*, 24 S.W.3d 21 (Mo.App. W.D. en banc 2000).[2] In any event, cases such as *Peterson v. National Carriers*, 972 S.W.2d 349 (Mo.

App. W.D.1998), have held that an expert may rely on hearsay in rendering an opinion. Any weaknesses in the foundation for an opinion that relies on hearsay can be brought out on cross-examination, and affect only the opinion's weight. No authority supports Ms. Irving's suggestion that an expert opinion which came in without objection, if based on hearsay such as this, is entitled to no weight as a matter of law. Point denied.

Ms. Irving also argues that the Commission erred in finding that she failed to present competent and substantial evidence to establish that Derson had more than five employees, and that, as such, Derson was not subject to the worker's compensation act under Section 287.030(3). Because we affirm the Commission's judgment based on lack of proof of causation, we need not reach this issue.

For all these reasons we affirm.

Presiding Judge SMART, and Judge ELLIS, concur.

---

2. In *Butler* the majority so held in regard to expert testimony which the dissenting judges found to be unworthy of weight based on its

inherently contradictory nature, not based on hearsay. *Id.* at 53–57 (Stith, J. dissenting).