Charles KUYKENDALL, Appellant,

v.

GATES RUBBER COMPANY, Respondent.

No. 27725.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 6, 2006.

Michael Moroni, Burns, Taylor, Heckemeyer & Green, LLC, Cape Girardeau, for appellant.

Kenneth C. McMananaman, Cape Girardeau, for respondent.

ROBERT S. BARNEY, Judge.

Appellant Charles Kuykendall ("Claimant") appeals from the final award of the Labor and Industrial Relations Commission ("the Commission") affirming the decision of the Administrative Law Judge ("ALJ") regarding Claimant's request for worker's compensation disability benefits based on occupational injuries suffered on or about March 10, 2000, while working for Gates Rubber Company ("Employer").

In particular, Claimant takes umbrage with the Commission's denial of his claims for compensation relating to surgeries performed on his left wrist *after* June 11, 2001, and its denial of his claims for Reflex Sympathetic Dystrophy ("RSD") in his left upper extremity, permanent total disability, future medical benefits, depression,

anxiety, sleep interference, restless leg syndrome, and myofascial pain in both shoulders.[1] Claimant now brings three points on appeal.[2]

The record reveals Claimant, who was forty-eight years old at the time of the hearing in this matter, was a "spiral line operator" for Employer, a company which manufactures rubber hoses. Claimant began working for Employer on July 11, 1988, and was employed there for a period of twelve years until March 17, 2003. As a spiral line operator, Claimant had several job responsibilities all of which involved repeatedly and continuously twisting his hands, wrists and shoulders.

On March 10, 2000, Claimant saw a physical therapist at work regarding "swelling of [his] fingers [and][his] wrist, and the elbow area of both arms" as well as swelling in both hands. He stated that he had been having problems with his hands, arms, and wrists for three or four months prior to meeting with the therapist, but that he had not mentioned it to Employer prior to March 10, 2000.

Employer sent Claimant to see Dr. Gregory Tobin ("Dr. Tobin"). After examining Claimant, Dr. Tobin gave Claimant wrist braces; a prescription for hydrocodone; and recommended physical therapy at Restart. Dr. Tobin also told Claimant he believed Claimant was suffering from a "FCC tear" to the cartilage in both of his wrists.

Claimant saw Dr. William Kapp ("Dr. Kapp") on May 24, 2000, for "bilateral shoulder pain" in both of his shoulders.

Dr. Kapp ordered "a bone scan of the bilateral hands and wrists ..." and a "subacromial injection in the bilateral shoulders." The bone scan showed "torn triangular fibrocartilage in both wrists."

Dr. David Brown ("Dr.Brown"), a bone and joint specialist, performed MRI arthrograms on both of Claimant's wrists on June 21, 2000. Dr. Brown advised that Claimant had a small tear in "the left TFCC" and "a defect in the volar aspect of the left lunotriquetral ligament" of the left wrist as well as significant damage to the right wrist.

On July 18, 2000, Dr. Brown performed surgery on Claimant's right wrist.

Claimant saw his family physician, Dr. David Catron ("Dr. Catron"), on October 19, 2000, for depression and anxiety and Dr. Catron prescribed him the anti-depressant Serzone as well as Valium.

Thereafter, on November 20, 2000, Dr. Kapp performed a "[s]houlder arthroscopy and subacromial decompression" on Claimant's right shoulder. In a follow-up appointment with Claimant on December 20, 2000, Dr. Kapp noted Claimant "has developed some myofascial pain in his upper extremity. States he has fallen three times over the last week on the ice and snow, therefore slowing his progress."

On January 8, 2001, Claimant saw Dr. Rickey Lents ("Dr. Lents") regarding pain in his left wrist. Dr. Lents later performed arthroscopic surgery on Claimant's left wrist to excise cartilage from the joints on June 1, 2001.

---

1. The Commission found Claimant suffered a work related injury such that he "sustained a 40 [percent] permanent partial disability of the right upper extremity at the level of the shoulder;" that he "sustained a 20 [percent] permanent partial disability of the hand at the level of the [left] wrist;" that he was entitled "to an additional 20 [percent] for multiplicity;" and that he was entitled to an award for disfigurement.

2. In his appellate brief, Claimant limits his appeal to the Commission's finding that he was entitled to awards for "[i]njuries to the left arm including an ulnar shortening, a left wrist fusion, and [RSD];" for "depression/anxiety, restless leg syndrome, and sleep interference;" and "myofascial pain in the shoulders." To the extent possible, this Court shall recite only those facts necessary for a discussion of these particular injuries.

Thereafter, the record reveals Claimant tripped over a garden hose at home and fell down. He testified that he twisted his body during the fall and he "landed on [his] shoulder and [his] back shoulder blade" leaving his arm "up in the air." He testified that he did not think the fall had any effect on him and he had no increase in pain from the fall.

Shortly thereafter, however, Dr. Lents saw Claimant on June 25, 2001, for a post-operative exam. Dr. Lents noted Claimant reported that he had "[t]ripped over the garden hose at home and fell recently and has had a lot more swelling and pain since that time. On exam, his wrist is more swollen than before and is tender to palpation. Repeat xrays today show no fracture but he is quite swollen." As a result, Dr. Lents placed Claimant's left arm "in a short arm cast."

Claimant again saw Dr. Catron for stress and depression on August 20, 2001, at which time Dr. Catron noted Claimant "is not doing well at all" due to a personal situation with his brother. The following month, on September 21, 2001, Dr. Catron noted Claimant "is still not doing well." Dr. Catron increased Claimant's prescription for Effexor.

On August 30, 2001, Dr. Lents again examined Claimant's left wrist and found "he may be developing a little RSD...."

Claimant saw Dr. William Strecker ("Dr. Strecker") on September 28, 2001, "for bilateral wrist pain...." Dr. Strecker noted that while Claimant had been "doing fairly well" post-operatively with his left wrist,

> [Claimant] *slipped on a garden hose and landed on his left wrist.* There was some concern as to whether or not he may have had a fracture. He was placed in a short arm cast for approxi-

mately three weeks; and since that time, he has had complaints of marked pain in the left wrist, and inability to use the wrist. It was Dr. Lents['] feeling that he may have a[RSD]....

(Emphasis added.)

Dr. Strecker also observed that Claimant's left shoulder was neither tender nor unstable; however, Claimant "exhibit[ed] marked guarding of the entire upper extremity." Dr. Strecker further noted that Claimant did have "an ulnar positive variance" in his left wrist. Dr. Strecker wrote that "[Claimant] may also have an ongoing ulnar abutment or TFC irritation as a stimulus to [the RSD], but it is difficult to ascertain that because of his exaggerated symptomatolgy."

Dr. Wai Chiu ("Dr. Chiu"), a pain management specialist, began treating Claimant for his RSD symptoms in October of 2001. In early November of 2001, Dr. Chiu felt that Claimant's "left upper extremity RSD is controlled."

Then, on December 4, 2001, Dr. Strecker performed a "[w]rist arthroscopy with partial synovectomy and debridement of TFC" as well as "[u]lnar shortening ..." on Claimant's left wrist. Thereafter, Claimant experienced some relief, and Dr. Strecker treated Claimant with physical therapy and medication. Dr. Strecker did note on several occasions that "there is some symptom magnification ..." on Claimant's part; that "when sometimes distracted, [Claimant's] motion is noted to be better;" and that Claimant "exhibits marked guarding and protection of the upper extremity."

Dr. Strecker then sent Claimant to see Vic Zuccarello ("Mr. Zuccarello"), a rehabilitation therapist, and Mr. Zuccarello performed a functional capacity evaluation on Claimant.[3]

---

**3.** In his report, Mr. Zuccarello concluded that "[Claimant's] performance is punctuated by symptom magnification behavior and submaximal effort...."

In July of 2002, Claimant reported to Dr. Strecker that the pain in his left wrist was "markedly improved" when he wore the "clamshell" splint which immobilized his wrist, but that when he removed the brace his pain increased "from a two to a seven." Dr. Strecker discussed the possibility of a wrist fusion with Claimant. Dr. Strecker told Claimant the procedure would be "irreversible;" that it would result in a "complete loss of motion to his wrist;" and that the procedure was not guaranteed to alleviate his pain.

Dr. Strecker also referred Claimant to Dr. John Graham ("Dr.Graham"), a pain management specialist. Dr. Graham found that he could not "see any objective findings that would account for [Claimant's] severe complaints." Further, it was Dr. Graham's opinion that Claimant did not suffer from RSD.[4]

Dr. Richard Coin ("Dr.Coin"), a hand and wrist specialist, evaluated Claimant on August 13, 2002. Upon physical examination of Claimant's left wrist, Dr. Coin noted there was "little mobility in the wrist," but that Claimant had "good mobility in all of the digits...." He observed that a radiological examination of Claimant's left wrist revealed "a negative ulnar variance and degenerative changes at the first metacarpocarpal [sic] joint." Dr. Coin did not believe Claimant was suffering from RSD when he examined him. Further, Dr. Coin noted that typically injuries like those experienced by Claimant were "from the forceful application of an extension-pronation force to the axial loaded wrist, such as a fall on an out stretched hand or forceful rotation injury."

On December 20, 2002, Dr. Strecker performed a wrist fusion surgery on Claimant's left wrist. Claimant stated the fusion surgery seemed to help with his pain.

On May 2, 2003, Dr. Strecker noted that "there are inconsistencies in [Claimant's] active range of motion ..." and "there may be some symptom magnification" on Claimant's part. Dr. Strecker restricted Claimant to using his left arm "only as an assist and no lifting greater than two pounds with his left arm non repetitive ..." and released Claimant from his care after finding that Claimant was at his "maximum medical improvement." Dr. Strecker felt that at that time Claimant "had a 55 percent permanent partial disability of his upper extremity on the left side."

Dr. Catron, who saw Claimant on April 2, 2003, noted Claimant was "not doing real well" due to losing his job and felt Claimant "does appear a bit frightened but is not in severe distress...." Several months later, on June 6, 2003, Dr. Catron noted Claimant was "significantly improved" and "feeling much better."

At the time of the hearing, Claimant was still seeing Dr. Catron due to his continued declarations of pain. He was prescribed "Duragesic patches" and Hydrocodone. Claimant testified that he continued to suffer from numbness and hypersensitivity in his left arm such that he was compelled to roll his shirt sleeve up so that it did not touch his skin. Claimant stated his RSD pain has increased since his last surgery with Dr. Strecker.

Claimant also testified that "[p]hysically, [he does not] feel like doing anything." He stated his left hand is "sensitive to heat, cold, [and] touch" and that he only uses it to assist his right hand. Claimant

---

4. In his March 27, 2002, letter to Dr. Strecker about Claimant, Dr. Graham wrote:

I do not see any findings on his exam or in his history that in my opinion would be consistent with the diagnosis of RSD at this time. The patient has focal areas of pain and sensitivity to touch, though he does not present with any other findings of RSD.

also testified that he had been having sleep problems, and it was rare if he got more than an hour and a half of sleep at a time. He stated he had been suffering from depression and had gained forty pounds due to his inability to be active. He detailed that he can no longer mow his own yard; needs help dressing himself; cannot do any household chores; cannot walk more than "two blocks at a time ..." before having to stop; cannot open a soda bottle with his left hand nor can he lift anything with it; is unable to attend to various personal hygiene tasks; and has difficulty sitting for long periods of time due to discomfort. He also testified that he was not able to go back to work for Employer because Employer told him he could not return to work until he could "do 100 percent of [his] job without any restrictions." Claimant also stated he has not sought other work because the medication he was taking slowed down his thinking and made him "pretty short fused."

In support of his testimony, Claimant entered into evidence the deposition and impairment rating evaluation of Dr. Gary Eaton ("Dr. Eaton") made on August 26, 2003. Dr. Eaton is a pain management specialist and a licensed physiatrist.

The record reveals that during his psychometric evaluation of Claimant, Dr. Eaton determined, in part pertinent to our review, that Claimant has "complex ... RSD [of the] left upper extremity. 15 [percent] of the left upper extremity at the level of the elbow;" demonstrates "[m]yofa[s]cial pain bilateral upper extremities to the shoulders. 15 [percent] of the whole person;" and suffers from "[a]nxiety with a post traumatic stress component and depression with restless leg syndrome and sleep issues. 25 [percent] of the whole person."

Dr. Eaton found Claimant's "work is a contributing and substantial factor to the injuries and disabilities" and that the disability ratings listed were "[d]irectly attributable to this work injury including treatments, complications of treatment and sequelae...." Dr. Eaton concluded "to a reasonable degree of medical certainty" that Claimant is "totally and completely disabled as a result of his work injury of March 10, 2000, and associated health problems" and that all of the treatment received by Claimant was "reasonable and necessary to cure and relieve the occupational disease[s] ..." from which he suffered.

Employer offered the report and deposition of Dr. Richard Lehman ("Dr. Lehman") into evidence. Dr. Lehman evaluated Claimant on February 14, 2004, and found that Claimant had good "mechanics and strength" in his left hand, even though his wrist was fused and immobile. Dr. Lehman felt Claimant's "symptoms ... are in excess of his medical[ly] identifiable problems," and that there was some "symptom magnification" on Claimant's part. Dr. Lehman also found Claimant's complaints were "verbose" and "the length and frequency of his treatment are not in keeping with his objective complaints." Dr. Lehman also stated that Claimant's "symptoms are far in excess of anything once [sic] could expect ..." and Claimant "is at maximum medical benefit." Dr. Lehman concluded there "is absolutely no causal connection between [Claimant's] ['numerous maladies'] and his work." Dr. Lehman opined that the original cartilage tear in the left wrist was probably "a degenerative type tear and that might be from garden variety aging or have to do with the mechanics of the wrist...." [5]

---

**5.** We note only Claimant testified at the hearing in this matter. The depositions of Drs. Eaton, Lehman, Strecker, and Coin were entered into evidence at the hearing.

As already stated, following the hearing, the ALJ denied Claimant's request for compensation relating to the surgeries performed on his left wrist *after* June 11, 2001, and also denied his claims resulting from the RSD in his left upper extremity, myofascial pain in both shoulders, depression, anxiety, restless leg syndrome, sleep interference, future medical benefits, and permanent total disability.

Claimant filed his application for review with the Commission on September 30, 2005. On April 20, 2006, the Commission issued its final award and incorporated the decision of the ALJ. This appeal by Claimant followed.

 When reviewing the decision of the Commission in workers' compensation cases

> [w]e 'may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other: (1)[t]hat the commission acted without or in excess of its powers; (2)[t]hat the award was procured by fraud; (3)[t]hat the facts found by the commission do not support the award; and (4)[t]hat there was not sufficient competent evidence in the record to warrant the making of the award.'

*Shelton v. Missouri Baptist Med. Ctr.*, 42 S.W.3d 700, 701 (Mo.App.2001) (quoting § 287.495.1).[6] In *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003), the Supreme Court of Missouri set out that "[a] court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence."[7] Stated another way, if an award is contrary to

the overwhelming weight of the evidence, then it is not supported by competent and substantial evidence. *Id.* at 223. We do not view the evidence in the light most favorable to the award. *Id.*

 Generally, in reviewing a workers' compensation award, we review the findings of the Commission and not those of the ALJ. *Clark v. FAG Bearings Corp.*, 134 S.W.3d 730, 734 (Mo.App.2004). However, if, as in the present matter, "the Commission incorporates the ALJ's award and decisions . . . we consider the findings and conclusions of the Commission as including the ALJ's award." *Martinez v. Nationwide Paper*, 168 S.W.3d 566, 568 (Mo.App.2005). "The Commission reviews the record, and, where appropriate, it will also determine the credibility of witnesses and the weight of their testimony, resolve any conflicts in the evidence, and reach its own conclusions on factual issues *independent* of the ALJ." *Shaw v. Scott*, 49 S.W.3d 720, 728 (Mo.App.2001). "The Commission's interpretation and application of the law . . . are not binding on this [C]ourt and fall within our realm of independent review and correction." *Bowers v. Hiland Dairy Co.*, 132 S.W.3d 260, 263 (Mo.App.2004).

In his first point, Claimant contends the Commission "erred as a matter of law in finding that the conditions and treatment of . . . Claimant's left wrist and RSD after June 11, 2001[,] and any resulting mental conditions and future medical benefits and disability were not caused by the [March 10, 2000, work related] accident. . . ."

In his argument, Claimant asserts the Commission found that "the fall at home *aggravated* [Claimant's] work-related condition and made it more symptomatic and

6. All statutory references are to RSMo 2000.

7. We note several cases overruled by *Hampton,* to the extent they are in conflict with the holding therein, are cited in this opinion in

support of other principles of law not affected by the *Hampton* ruling. *Id.* at 224–32. No further acknowledgment of *Hampton's* effect on those cases needs to be recited hereafter.

disabling" and also found that the "fall was an independent intervening cause." (Emphasis added). Based on the foregoing findings, Claimant argues, "the Commission excluded the possibility of an independent intervening cause, and rather found as a matter of law that the RSD condition was compensable." Therefore, Claimant argues that by finding that the "RSD resulted from an aggravation of the underlying injury, the Commission should have found that the RSD and the disability resulting from the RSD were directly traceable to the accident." Accordingly, as Claimant maintains, the facts found by the Commission did not support the award that was made.[8] *See* § 287.495.1(3).

Very closely related to his first point, Claimant's second point on appeal asserts the Commission erred in finding that his "complain[ts] and injuries after June 11, 2001[,] including RSD, mental conditions and future medical benefits including disability were not caused by the [work related] accident. . . ." He maintains the Commission's factual finding that Claimant "fell on his wrist when he tripped over a water hose at his home . . ." was not supported by "sufficient competent evidence in the record to warrant making the award because the finding . . . [was] against the *overwhelming weight of the evidence* . . .," and, hence, was contrary to section 287.495.1(4).

As Claimant's point one contends the facts found by the Commission do not support the award, and his second point asserts "there was not sufficient competent evidence in the record to warrant making the award," we shall address the points

---

**8.** Claimant cites this Court to *Cahall v. Riddle Trucking, Inc.,* 956 S.W.2d 315, 322 (Mo.App. 1997), in support of his proposition that "[e]very natural consequence that flows from the injury likewise arises out of employment, unless it is the result of an independent intervening cause attributable to the employee's own intentional conduct."

In *Cahall,* the claimant injured his right knee while working for the employer in 1988. *Id.* at 317. As a result of the injury he had surgery three times and had a metal plate installed in his knee. *Id.* at 317–18. He filed a worker's compensation claim at that time and it was determined his "right knee was fifty percent permanently partially disabled." *Id.* Later, in 1994, while he was self-employed, Claimant "slipped off a step while climbing down from his truck . . . and scraped his right leg along the metal step." *Id.* He then had to have a skin graft on his "right leg in the same area as the 1988 injury. . . ." *Cahall,* 956 S.W.2d at 318. In October of 1994, he "bruised his right leg in a traffic accident" and had to have surgery to remove the metal plate placed in his leg as a result of the original 1988 injury. *Id.* In 1995, he again had problems with his leg relating to blood circulation and vein problems. *Id.* at 319.

The *Cahall* claimant then filed a "Motion to Reopen Case for the Purposes of Establishing Needs of Additional Medical Care . . ." which was denied by the ALJ. *Id.* at 318. He also filed a "motion to reopen the 1988 claim" and received an evidentiary hearing on the matter. *Id.* The evidence adduced by depositions from various physicians showed the claimant's knee "aged severely" due to the original 1988 injury; that both 1994 accidents "aggravated the condition of claimant's right knee after the 1988 injury;" that "the 1994 accidents and injuries were 'events which triggered the need for treatment;' " that the claimant was suffering from " 'recurring problems and new problems with the right leg;' " and that the claimant's "vein problems were triggered by his 1994 accidents. . . ." *Cahall,* 956 S.W.2d at 319–20. The Commission found "the 1988 injury to be the cause of the [claimant's] need for [continuing] medical treatment . . ." and found the employer "liable for future medical care as it related to the [1988] knee injury. . . ." *Id.* at 320.

On appeal, the *Cahall* employer argued the Commission's finding was in error because "the overwhelming weight of the evidence indicates that [the claimant's] medical condition resulted from the 1994 accidents." *Id.* at 322. The Eastern District of this Court affirmed the award of the Commission based on the claimant's testimony at the hearing as well as the medical opinions offered. *Id.* at 322–23.

together, before proceeding with our review of his third point, which centers on Claimant's allegations of Commission error resulting from its findings that Claimant's "my[o]fascial shoulder pain which occurred after December 6, 2000[,] was not related to his work . . . ."

▮▮▮ "Occupational diseases are compensable under the Missouri Workers' Compensation Act, [section] 287.067.1[and] .2." *Kent v. Goodyear Tire and Rubber Co.*, 147 S.W.3d 865, 867 (Mo.App.2004). "The statute requires that the condition be an 'identifiable disease arising with or without human fault and in the course of the employment.'" *Id.* (quoting § 287.067). "Subsection 2 of . . . [section] 287.067 adopts the causation standard for occupational disease claims as stated in [section] 287.020.2; the employee's work must be 'a substantial factor' in causing the medical condition." *Id.* (quoting § 287.020.2). "Thus, for an injury to be compensable under the Missouri Workers' Compensation Act, the work performed must have been a substantial factor in causing the medical condition or disability." *Id.* at 867–68. "The claimant [also] bears the burden of proving a direct causal relationship between the conditions of his employment and the occupational disease." [9] *Jacobs v. City of Jefferson*, 991 S.W.2d 693, 696 (Mo.App.1999).

In our analysis we first observe that the Commission found that:

[b]ased on a review of the evidence including the June 11 and June 25, 2001[,] reports of Dr. Lents and the September 28, 2001[,] report of Dr. Strecker, and the testimony of Dr. Coin regarding the fall, [the Commission] find[s] that after [Claimant's] June 1 surgery, [Claimant] was recovering well until he tripped at home over a garden hose and landed on his left wrist. *The fall aggravated* [Claimant's] left wrist and caused more swelling and pain. [The Commission finds Claimant's] version of the fall that he did not land on his wrist and that he had no swelling or increase in symptoms on June 25, was not credible.

(Emphasis added.) As a result, the Commission further found *"the fall at home aggravated [Claimant's] work-related condition* and made it more symptomatic and disabling." (Emphasis added.) The Commission also determined Claimant failed to meet his burden of proof that his conditions and surgeries which occurred after June 11, 2001, were clearly work related and that his work was a substantial factor in the cause of those medical conditions and disability.

As previously set out, Dr. Lents operated on Claimant's left wrist on June 1, 2001. He saw Claimant on June 11, 2001, and noted the "wound is healed nicely." Dr. Lents removed the sutures on that date and noted there were to be no x-rays done at Claimant's follow-up appointment in two weeks.

Claimant testified that thereafter he tripped over a garden hose and fell down while at his home. He testified that he twisted his body during the fall and he "landed on [his] shoulder and [his] back shoulder blade" leaving his arm "up in the air." He testified that he did not think the

---

**9.** " 'Arising out of' and 'in the course of' employment are two separate tests, and both must be met before an employee is entitled to compensation." *Simmons v. Bob Mears Wholesale Florist*, 167 S.W.3d 222, 225 (Mo. App.2005) (quoting *Abel v. Mike Russell's Std. Serv.*, 924 S.W.2d 502, 503 (Mo. banc 1996)). "To meet the test of an injury 'arising out of'

the employment, the injury must be a natural and reasonable incident of the employment, and there must be a causal connection between the nature of the duties or conditions under which employee is required to perform and the resulting injury." *Id.* " 'In the course of employment' refers to the time, place and circumstance of an employee's injury." *Id.*

fall had any effect on him and he had no increase in pain from the fall.

However, when Claimant saw Dr. Lents on June 25, 2001, Dr. Lents noted Claimant reported he had "[t]ripped over the garden hose at home and fell recently and has had a lot more swelling and pain since that time. *On exam, his wrist is more swollen than before and is tender to palpation. Repeat x-rays today show no fracture but he is quite swollen.*" (Emphasis added.) As a result, Dr. Lents put Claimant's left arm "in a short arm cast" for nearly two months. *It was a month after the fall, on August 30, 2001, when Dr. Lents first noted Claimant might be suffering from RSD.* In September of 2001, Dr. Lents found Claimant "probably has developed an RSD...."

On September 28, 2001, Dr. Strecker wrote in his examination notes that Claimant had "slipped on a garden hose *and landed on his left wrist.*" (Emphasis added.) Dr. Strecker noted "some concern as to whether or not he may have had a fracture" and wrote that "since [the time of the accident], he has had complaints of marked pain in the left wrist, and inability to use the wrist."[10] It was on this date that Dr. Strecker first noted Claimant might be suffering from RSD.

Thereafter, on October 5, 2001, Dr. Chiu also diagnosed Claimant as having RSD. In early November of 2001, Dr. Chiu felt that Claimant's "left upper extremity RSD [wa]s controlled."

Here, in finding Claimant's "version of the fall that he did not land on his wrist and that he had no swelling or increase in symptoms on June 25, was not credible," the Commission specifically found that "[t]he medical records contradict [Claimant's] testimony" relating to the fall. In our review, the medical records reveal that following the July 18, 2000, "[a]rthroscopic debridement of right central TFCC tear" surgery performed by Dr. Brown on his *right wrist*, Claimant healed well; had no further problems with that area; and did not develop RSD or other problems in his right wrist.

■ The salient difference between Claimant's recovery from the 2000 surgery to his right wrist and the June 2001 surgery to his left wrist was that following the first surgery to his left wrist there is support in the record for the Commission's finding that he thereafter suffered a fall at home over the garden hose. As the Commission found, as a result of the fall and further injury to the left wrist, Claimant also had to have additional surgeries and, ultimately, his left wrist was fused.

Indeed, it was not until after the fall at home in June of 2001 that Claimant was diagnosed with RSD. The record is silent regarding whether Claimant was suffering from RSD prior to the fall in question.

In his deposition testimony relating to the cause of injuries such as those seen in Claimant's left wrist, Dr. Coin noted that typically those types of injuries occur

---

10. We note that on October 16, 2002, over a year after Claimant told Dr. Strecker he had *"landed on his left wrist,"* Claimant told Dr. Strecker a different story regarding the fall. Dr. Strecker noted "there has been some concern in regards to the mechanism of injury, that being that he relates having fallen on *his left arm* under Dr. [Lents's] treatment." (Emphasis added.) Claimant informed Dr. Strecker at that time that "he *did not fall or land on his wrist,* but landed on the upper portion of his arm...." (Emphasis added.) Based on Claimant's assertion that he did not fall on his wrist, Dr. Strecker then noted "[a]s to the fall which he relates to me [in that he reports falling on his arm and not his wrist], I don't feel that was a significant contributing factor to his present problem." Later, based on this premise, Dr. Strecker found that any RSD Claimant may have been suffering from was probably "a consequence of his previous surgeries and his injuries...."

"from the forceful application of an extension-pronation force to the axial loaded wrist, such as a fall on an out stretched hand or forceful rotation injury." In the absence of evidence of the aforementioned "forceful application of an extension-pronation force to the axial loaded wrist," Dr. Coin concluded "a work related origin would be in question." Dr. Lehman also concluded in his deposition that there "is absolutely no causal connection between [Claimant's] ['numerous maladies'] and his work." He felt that the original cartilage tear in the left wrist was probably "a degenerative type tear and that might be from garden variety aging or have to do with the mechanics of the wrist...."

Although Dr. Eaton found Claimant's "work is a contributing and substantial factor ..." in Claimant's left wrist problems and subsequent RSD, he also related in his deposition that he had *no knowledge* relating to Claimant's accident with the garden hose which took place during his treatment.

The Commission found the opinions of Drs. Lehman and Coin "regarding the RSD ... in the left upper extremity, the left wrist arthroscopy with partial synovectomy and debridement of the TFC and ulnar shortening, and the left wrist fusion surgery," more credible than the opinions of Dr. Lents, Dr. Strecker and Dr. Eaton as related to this particular malady. It was within the Commission's province to do so. *Russell v. Invensys Cooking & Refrigeration,* 174 S.W.3d 15, 23 (Mo.App. 2005). There is sufficient evidence to support the Commission's finding that Claimant's left wrist problem and the RSD which developed after June 11, 2001, were not "medically causally related to the work-related accident...."

■ "With regard to factual issues, the appellate court defers to the ... Commission's decisions regarding the weight given to witnesses' testimony, and is bound by the Commission's factual determinations when the evidence supports either of two opposing findings." *Kent,* 147 S.W.3d at 868. " 'The acceptance or rejection of medical evidence is for the Commission.' " *Russell,* 174 S.W.3d at 23 (quoting *Sullivan v. Masters Jackson Paving Co.,* 35 S.W.3d 879, 884 (Mo.App.2001)). Furthermore, as a reviewing court, we "may not substitute [our] judgment for that of the Commission's as to the issue of witness credibility." *Tangblade v. Lear Corp.,* 58 S.W.3d 662, 670 (Mo.App.2001). It has long been held that " '[t]he fact finder may reject all or part of an expert's testimony.' " *Russell,* 174 S.W.3d at 23 (quoting *Bennett v. Columbia Health. Care,* 134 S.W.3d 84, 92 (Mo.App.2004)). "We will uphold the Commission's 'decision to accept one of two conflicting medical opinions' if such a finding is supported by competent and substantial evidence." *Id.* (quoting *Birdsong v. Waste Mgmt.,* 147 S.W.3d 132, 137 (Mo.App.2004)). "When witnesses are deposed and do not testify live before the ALJ, the Commission is just as able as the ALJ to determine credibility from the written record." *Birdsong,* 147 S.W.3d at 137–38. " 'We will not overturn the Commission's determination regarding conflicting medical opinions, unless it is against the overwhelming weight of the evidence.' " *Russell,* 174 S.W.3d at 23 (quoting *Bennett,* 134 S.W.3d at 92).

■ Next, in conjunction with Claimant's second point, we also address the Commission's finding that "there is insufficient evidence to support a finding that [Claimant's] anxiety with posttraumatic stress component, restless leg syndrome, and depression with sleep interference, are medically causally related to the work-related accident...."

On October 10, 2000, Dr. Tobin noted Claimant "does seem to be depressed today." Thereafter, Claimant saw Dr. Catron on October 19, 2000, for depression

and anxiety. Dr. Catron noted that Claimant told him his "nerves [were] just shot;" that he had mood swings; that "he gets extremely depressed, very anxious and has panic attacks;" and that "[h]e has even tried three of his Ativan at a time and they don't seem to help." Claimant also told Dr. Catron he "has had a really bad year" in that his father and father-in-law had died and he had several surgeries. Dr. Catron prescribed Serzone and Valium for Claimant.

Claimant again visited Dr. Catron on November 2, 2000, for continuing problems with depression and Dr. Catron gave him a prescription for Diazepam. In May of 2001, Dr. Catron prescribed Effexor to Claimant for his depression and discontinued his prescription for Serzone.

On August 20, 2001, Dr. Catron noted Claimant "is not doing well at all." Claimant told Dr. Catron his stress stemmed from the fact that his younger brother, who was an alcoholic and a drug abuser, had recently tried to commit suicide; had suffered several medical problems; had attacked Claimant; and had threatened to kill Claimant. Dr. Catron increased Claimant's prescription for Effexor.

The following month, on September 21, 2001, Dr. Catron noted Claimant "is still not doing well." Claimant again told Dr. Catron he "has had a bad year" in that his father and father-in-law had died; his brother had threatened to kill him; he was injured at work; he had seven surgeries and he experienced complications following two of the surgeries; and he might lose his job. Claimant reported he was "getting a lot of trouble at work" and "he may actually lose his job." Claimant also reported "he is extremely hot-hea[d]ed and can't tolerate anything anymore." Dr. Catron recommended counseling and Claimant informed him "he doesn't want to do that."

Dr. Catron again increased his Effexor prescription.

Dr. Catron saw Claimant again on August 16, 2002, and noted Claimant was "better with his depression than he has been for ages." Dr. Catron then saw Claimant on April 2, 2003, and noted Claimant "is not doing real well" because he lost his job. He noted Claimant "does appear a bit frightened but is not in severe distress...." Several months later, on June 6, 2003, Dr. Catron noted Claimant was "significantly improved" and "feeling much better." In October of 2003, Dr. Catron observed that Claimant was "physically feeling relatively well;" however, he found Claimant was "fairly stressed" because his brother had suffered a stroke. Accordingly, Dr. Catron decided to "continue his meds."

Furthermore, in January of 2004, Dr. Catron observed Claimant "has been under a lot of stress" because "[h]is mother-in[-]law is now in a nursing home" and "[h]is mother has been diagnosed with early Alzheimer [sic]." Dr. Catron noted Claimant's "hand i[s] no worse."

At the hearing, Claimant testified that it was rare for him to get more than an hour and a half of sleep at a time; that he suffered from depression; that he had gained forty pounds due to his inability to be active; that he could no longer engage in many of the activities he used to participate in; and that he could not walk more than "two blocks at a time ..." before having to stop.

During his psychometric evaluation of Claimant, Dr. Eaton found Claimant "scored 45 for severe depression." Dr. Eaton determined Claimant has "anxiety with a posttraumatic stress component and restless leg syndrome" and that Claimant has "depression with sleep interference."[11]

11. We observe that the sole mention of restless leg syndrome is found in Dr. Eaton's testimony and documentation. Claimant

Dr. Eaton also stated Claimant "had significant sleep interference complicating his ability to concentrate...." Dr. Eaton related that Claimant's "attention and concentration are significantly impaired due to depression, anxiety...." He concluded Claimant had "25 percent [disability] of the whole person" due to "anxiety, posttraumatic stress component with depression, restless leg syndrome, and sleep issues."

Claimant likewise entered into evidence the deposition of Mr. James England ("Mr.England"), a vocational and occupational rehabilitation specialist, into the record. Mr. England stated that when he spoke with Claimant on April 27, 2004, Claimant appeared "very tired looking and very depressed looking" and acted "almost like [he was] in a fog emotionally." Claimant described himself to Mr. England as "emotionally drained" and reported that he is in constant pain such that he cannot sleep through the night.

Here, Claimant's medical records are replete with citations to his depression and anxiety; however, in our review of the record, Claimant's complaints of anxiety and depression appear to be connected with his "significant non work related personal hardships ...," as the Commission found, as opposed to being related to his work related injuries. Virtually every time Claimant reported he was suffering from depression and anxiety, he also recited a personal or familial reason for that stress.

It is our determination there was sufficient evidence in the record to support the Commission's finding that Claimant's depression, anxiety, restless leg syndrome, and sleep interference were not "clearly work related and his work was [not] a substantial factor in the cause of those medical conditions and disability."

Additionally, we observe the Commission found Claimant did not meet his "burden of proof that future medical treatment is medically causally related to conditions caused by the work-related accident or occupational disease." In denying Claimant's request for future medical care, the Commission noted that "[a]lthough there is evidence that [Claimant] is in need of future medical care for his overall condition, there is not sufficient medical evidence that the treatment that [Claimant] needs is a result of the compensable injuries or conditions and flows from the compensable accident or occupational disease." We agree with the Commission's finding with respect to Claimant's need for future medical treatment. It has long been held that future medical care must flow from the work related accident via evidence of a medical causal relationship between the condition and the compensable injury if the employer is to be held responsible. *Mickey v. City Wide Maintenance*, 996 S.W.2d 144, 149 (Mo.App.1999). "A claimant is not required to produce 'conclusive' testimony or evidence to support a claim for future medical benefits; it is sufficient if the evidence shows by 'reasonable probability' that he is in need of additional medical treatment by reason of the work-related accident." *Bowers*, 132 S.W.3d at 270 (quoting *Landers v. Chrysler Corp.*, 963 S.W.2d 275, 283 (Mo.App.1997)).

Additionally, we note that other than an expressed need for continuing pain medication, Claimant offered little evidence relating to his need for future medical care. Claimant failed to prove "by [a] 'reasonable probability' that he is in need of additional medical treatment by reason of the [original March 10, 2000,] work-related accident." *Bowers*, 132 S.W.3d at 270 (quoting *Landers*, 963 S.W.2d at 283).

himself did not offer any testimony regarding restless leg syndrome, and this Court could

find no other references in the record to this disorder.

■ Lastly, in conjunction with our review of Claimant's first and second point, Claimant asserts the Commission's finding that he "has failed to satisfy his burden of proof on the issue of permanent total disability ..." is incorrect.

■ To be totally disabled, an individual must be unable to return to any employment, not just unable to return to the employment he was engaged in when he was injured. § 287.020.7; *Sutton v. Vee Jay Cement Contracting Co.,* 37 S.W.3d 803, 811 (Mo.App.2000). "The test for permanent total disability is the worker's ability to compete in the open labor market in that it measures the worker's potential for returning to employment." *Sutton,* 37 S.W.3d at 811. The crucial "question is whether an employer can reasonably be expected to hire this employee, given his present physical condition, and reasonably expect him to successfully perform the work." *Id.*

Claimant's evidence showed that Dr. Catron found Claimant suffered from permanent disabilities as a result of his left wrist fusion and RSD. Further, in a diagnostic letter written on November 19, 2004, relating to Claimant's current medical issues, Dr. Catron wrote:

[Claimant] has multiple chronic medical illnesses. The thing that bothers him most at present is the severe [RSD] in his left hand that is a result of surgery ... The [RSD] appears to be a permanent condition. This reduces his [left] hand to essentially a claw and it is totally nonfunctional. I cannot foresee him ever being able to use this hand for anything significant again in his life. Additionally, he has even longer term history of hyperlipidemia, hypertension, COPD, and depression.

\* \* \*

As you can see, [Claimant] has multiple illnesses which are all significant, the worst of which is his [RSD]. All of these illnesses are essentially permanent, and the RSD especially is permanent and complete.

Additionally, Dr. Eaton concluded "to a reasonable degree of medical certainty" that Claimant is "totally and completely disabled as a result of his work injury of March 10, 2000, and associated health problems." Dr. Eaton also determined that Claimant had "90 percent disability of the left upper extremity at the level of the wrist;" "15 percent [disability] of the left upper extremity at the level of the shoulder" due to the RSD; "15 percent [disability] of the left upper extremity at the level of the shoulder" due to a left rotator cuff injury; "15 percent [disability] of the whole person" due to "myofascial pain" in both shoulders; and "25 percent [disability] of the whole person" due to "anxiety, posttraumatic stress component with depression, restless leg syndrome, and sleep issues."

Mr. England, the vocational therapist offered by Claimant, concluded Claimant would not be able to return to the same type of laborious work he had done in the past and that "he would not be able to successfully compete for other kinds of employment in the open labor market."

On the other hand, Employer introduced the deposition of Donna Abram ("Ms. Abram"), a vocational consultant, into evidence. Ms. Abram concluded Claimant had "a number of transferable skills and abilities...." Ms. Abram stated she found approximately 1,000 jobs Claimant could perform in the general labor market, and she felt he would be able to successfully return to the labor market.

Also, Dr. Strecker opined that Claimant "had a 55 percent permanent partial disability of his upper extremity on the left side," as opposed to being totally and permanently disabled. Additionally, Dr. Lehman believed that while Claimant would be

unable to use his left wrist in working, he "c[ould] work unrestricted in terms of his right wrist, right shoulder, and left shoulder."

Based on the foregoing evidence as well the Commission's previously stated findings that "any surgeries and conditions to [Claimant's] left upper extremity after June 11, 2001, ..." were not "medically causally related to the work related conditions," the Commission found "the opinions of Dr. Lehman, Dr. Strecker, and Ms. Abram[ ] that [Claimant] is not permanently and totally disabled are more credible than the opinions of Dr. Catron, Dr. Eaton and Mr. England that [Claimant] is permanently and totally disabled."

As previously related, the Commission's decision will be upheld if it is consistent with either of two conflicting medical opinions. *Hutchinson v. Tri–State Motor Transit Co.,* 721 S.W.2d 158, 162 (Mo.App. 1986). "Further, 'the fact finder may reject all or part of one party's expert testimony which it does not consider credible and accept as true the contrary testimony given by the other litigant's expert.'" *Sherman v. First Financial Planners, Inc.,* 41 S.W.3d 633, 637 (Mo.App.2001) (quoting *Kelley v. Banta & Stude Const. Co.,* Inc., 1 S.W.3d 43, 48 (Mo.App.1999)). "The Commission's choice is binding on this Court when there are permissive inferences which may be drawn from conflicting evidence." *Id.* We find there was "sufficient competent and substantial evidence to support the award ..." of the Commission with respect to its determination that Claimant was not permanently and totally disabled, and the award was not "contrary to the overwhelming weight of the evidence." *Hampton,* 121 S.W.3d at 222–23. Points One and Two are denied.

█ Lastly, in his third point on appeal Claimant maintains the Commission erred in finding his "my[o]fascial shoulder pain which occurred after December 6, 2000[,] was not related to work...." He maintains the Commission's finding was against the overwhelming weight of the evidence, § 287.495.1(4), "because there was no evidence that the intervening event [i.e., the fall on the ice and snow sometime after December 6, 2000] was the cause of the myofascial pain syndrome in [Claimant's] shoulders[,]" whereas Claimant "presented uncontradicted evidence that the myofascial pain was work related." [12]

Claimant argues Dr. Eaton's deposition testimony, which was based on his examination of Claimant and his review of Claimant's medical records, found that Claimant "demonstrates myofascial pain in both upper extremities to the shoulders," and concluded Claimant had "15 percent [disability] of the whole person" due to "myofascial pain" in both shoulders. [13]

Medical records reveal that Dr. Tobin initially examined Claimant's shoulders. In the patient status report, Dr. Tobin indicated that "it was a workers' compensation case." Claimant subsequently received treatment from Dr. Kapp. He first visited Dr. Kapp about pain in his shoulders on May 24, 2000. Dr. Kapp diagnosed Claimant with "bilateral shoulder impingement with rotator cuff tendonitis." He treated Claimant with subacromial injections in both shoulders and with therapy. Dr. Kapp ultimately performed su-

---

12. We carefully distinguish between Claimant's fall over the garden hose in June of 2001 and his falls on ice and snow which occurred in early December of 2000.

13. The ALJ mistakenly set out that Dr. Eaton had rated Claimant at 5 percent of the body as a whole for "treatment and complications from treatment for the myofascial pain in both upper extremities to the shoulders." As set out above, Dr. Eaton rated Claimant at 15 percent of the body as a whole for this particular malady.

bacromial decompression on the right shoulder in November of 2000. In a follow-up appointment with Claimant on December 20, 2000, Dr. Kapp noted Claimant "has developed some myofascial pain in his upper extremity. States he has fallen three times over the last week on the ice and snow, therefore slowing his progress." Dr. Kapp then sent him to the Hand Center "for a myofascial release program." On January 3, 2001, the Hand Center therapist noted "symptoms of myofascial pain with decreased range...."

The Commission found that although Dr. Kapp had been treating Claimant for shoulder pain since May 24, 2000, Claimant "was not diagnosed with myofascial pain until December 20 [2000] after [he] had fallen on the ice and snow three times in the week prior to December 20 [2000]." Based on the foregoing, the Commission determined Claimant failed to meet his burden of proof that his myofascial shoulder pain was work related and that his work was a substantial factor in the cause of his myofascial shoulder pain.

However, we disagree with the Commission's determination relating to the genesis of Claimant's myofascial pain, because the determination is against the overwhelming weight of the evidence as developed in the record. First, in the ALJ's findings of fact and conclusions of law, as adopted by the Commission, the ALJ found that Claimant's "work was a substantial factor in causing his bilateral shoulder impingement with rotator cuff tendonitis and was clearly work related," at least through December 6, 2000.

Second, the ALJ observed that while Dr. Lehman had made a blanket determination that there was "not a causal connection between [Claimant's] job activities and his injuries," the ALJ made an express determination that the contrary opinions of Dr. Eaton, Dr. Kapp and Dr. Tobin were "more credible than the opinion of Dr. Lehman" pertaining to Claimant's work being a "substantial factor in causing his bilateral shoulder impingement with rotator cuff tendonitis."

Third, Claimant met his burden of proof relating to the myofascial pain in his shoulders by way of Dr. Eaton's testimony. This testimony was not expressly contradicted by any credible, expert witness. Nor was there any medical testimony that Claimant's myofascial pain syndrome was *caused* by his falls on the ice or snow.

While we "defer to the Commission's decisions regarding the weight given to witnesses' testimony, and are bound by the Commission's factual determinations when the evidence supports either of two opposed findings," *Smith v. Tiger Coaches, Inc.*, 73 S.W.3d 756, 761 (Mo.App.2002), here there was no credible medical evidence opposing Dr. Eaton's findings.

■■■■■ We recognize, of course, that "acceptance or rejection of medical evidence is for the Commission ... and it is free to disbelieve uncontradicted and unimpeached testimony." *Houston v. Roadway Express, Inc.*, 133 S.W.3d 173, 179 (Mo.App.2004). "Even so, when a workers' compensation record shows no conflict in the evidence or impeachment of witnesses, 'the reviewing court may find the award was not based upon disbelief of the testimony of the witnesses.'" *Id.* (quoting *Corp v. Joplin Cement Co.*, 337 S.W.2d 252, 258 (Mo. banc 1960)). Furthermore, although expert medical testimony is not necessary to establish the cause of an injury if causation is a matter within the understanding of lay persons, *Silman v. William Montgomery & Assoc.*, 891 S.W.2d 173, 175 (Mo.App.1995), in the instant matter the ALJ simply lacked the expertise to make a determination that the falls on the ice or snow were the sole cause of the myofascial pain in Claimant's shoulders. "'When the condition presented is a sophisticated injury that requires surgical intervention or other highly scientific technique for diagnosis ... the proof of causation is not within the realm of lay understanding nor—in the absence of expert opinion—is the finding of causation within

the competency of the administrative tribunal.'" *Knipp v. Nordyne, Inc.*, 969 S.W.2d 236, 240 (Mo.App.1998) (quoting *Silman*, 891 S.W.2d at 175–76); *see Irving v. Missouri State Treasurer*, 35 S.W.3d 441, 445 (Mo.App.2000).

▮▮▮ Likewise, the Commission "'may not arbitrarily disregard and ignore competent, substantial and undisputed evidence of witnesses *who are not shown by the record to have been impeached*, and the Commission may not base their finding upon conjecture or their own mere personal opinion unsupported by sufficient competent evidence.'" *Houston*, 133 S.W.3d at 179–80 (quoting *Corp*, 337 S.W.2d at 258). "The [C]ommission cannot find there is no causation if the uncontroverted medical evidence is otherwise." *Hayes v. Compton Ridge Campground, Inc.*, 135 S.W.3d 465, 470 (Mo.App.2004).

The Commission's findings as relate to Claimant's disability resulting from myofascial pain in his shoulders are contrary to the overwhelming weight of the evidence. *Hampton*, 121 S.W.3d at 222–23. The Commission erred in finding that Claimant failed to meet his burden of proof in this matter. Point Three has merit.

The Commission's award as it relates to the denial of any benefits for Claimant's work related disability resulting from myofascial pain in his shoulders is reversed. The cause is remanded with directions to the Commission to enter a new award which recognizes a positive percentage disability resulting from Claimant's myofascial pain in his shoulders as the Commission may determine. In all other respects, the Commission's award is affirmed.

BATES, C.J., and LYNCH, J., concur.