Linda Sue RUSSELL, Respondent,

v.

INVENSYS COOKING & REFRIGERATION, Appellant,

and

Travelers Indemnity Company of Illinois, Appellant.

No. 26774.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 24, 2005.

Jeffrey W. Laney, Haden, Cowherd & Bullock, L.L.C., Springfield, for appellant.

Randy Charles Alberhasky, Alberhasky Law Firm, P.C., Springfield, for Respondent.

ROBERT S. BARNEY, Judge.

Travelers Indemnity Company of Illinois ("Travelers") and Invensys Cooking and Refrigeration ("Employer") (collectively "Appellants"), appeal from an award of the Labor and Industrial Relations Commission ("Commission") affirming, but modifying, the decision of the Administrative Law Judge ("ALJ") by awarding permanent total disability benefits and future medical expenses to Linda Russell ("Claimant"). On appeal, Appellants raise two points of error, as more fully explained below. First, Appellants maintain the Commission erred in modifying the ALJ's award because its award was not supported by substantial and competent evidence. Second, Appellants maintain the Commission erred by refusing to consider or find credible the opinions and testimony of its tendered expert, Dr. Norbert Belz. Such a refusal, Appellants maintain, is contrary to the overwhelming weight of the evidence and constituted an abuse of discretion. We affirm the award of the Commission.

The record reveals that on January 5, 2001, Claimant, a fifty-one-year-old female who had been working for Employer for twenty-nine years, arrived at work at about 4:30 a.m. and "[w]hile walking through the parking lot . . . fell, landing on the ice when both feet went out from under [her]." Claimant landed "on the small of [her] back" and felt immediate pain in her hip, her right leg, her right knee and her lower back. Claimant lay on the ground "for a few seconds" before some of her co-workers helped her up. Claimant started her shift as normal but "kept getting sorer and sorer" and then reported her parking lot accident to management later in the morning. Due to Claimant's increased pain, one of Employer's supervisors made her an appointment with Dr. Moore later that same day.

By the time Claimant was seen by Dr. Moore, her pain was "awful." He related to her she might have pulled some muscles; accordingly, he ordered x-rays and gave her a prescription for "muscle relaxers." He also advised her to avoid lifting, twisting, and prolonged sitting for the time being.

Claimant returned to work on January 9, 2001. On that same day, she saw Dr. Stanley Crown, her personal physician, due to her continued "horrific" pain from the fall in the parking lot. Dr. Crown noted she "[w]alk[ed] fairly hesitantly" and showed "[m]ild low back tenderness." He then tightened her restrictions, increased her prescription, and advised her to check back with him in six days. When she saw Dr. Crown on January 15, 2001, he noted she was "[s]till having pain in the low back," although she was only working four hours a day for Employer and taking vacation hours for the remainder of her work

day. Dr. Crown ordered Claimant to begin physical therapy, continue taking her prescribed medication, and noted that her condition appeared "unchanged."

On January 20, 2001, after working for several hours for Employer, Claimant went to the emergency room at Ozarks Medical Center because she, as she termed it, "couldn't stand the pain." At the emergency room, more x-rays were taken and she was given two injections for pain. The physician who cared for her at the emergency room noted that she was "very much in distress;" was in "acute pain;" that her x-rays showed an "acute lumbosacral strain;" and, that there was evidence of "severe osteoarthritic changes" in her vertebrae. Claimant did not return to work for Employer after this date.

Several weeks later, Claimant was referred to Dr. Rick Walker, an orthopedic surgeon. Over the course of several months, Dr. Walker gave her epidural injections for pain, an MRI, and continued her physical therapy. Thereafter, he referred Claimant to Dr. Glenn Kunkel for pain management.

Dr. Kunkel continued to treat her with pain medication and lumbar injections. He also performed a discogram on Claimant and applied a spinal stimulator. According to Claimant, none of these painful procedures alleviated her pain. Thereafter, she returned to Dr. Walker's care where he continued her prescriptions for pain management, namely her prescription for OxyContin, which she continued taking up through the time of the hearing in this matter.

Since the time of her accident, Claimant has never been cleared by her doctors to return to work.

At the hearing, Claimant testified that throughout her twenty-nine years of employment with Employer she performed repetitive work on the assembly line putting together ignition parts, but that now she cannot sit for any significant period of time and simply cannot concentrate on working due to her continued pain.

She related that she has been depressed due to her pain and also due to the probability of being in pain for the rest of her life. Claimant stated she is unable work, however, she watches her three-year-old granddaughter for several hours every Tuesday. Claimant also stated that on Saturdays she often kept the child for longer periods of time, but that her husband was usually around to help her. She further related that prior to her accident she did not have any recognizable back problems, other than "a couple of isolated times" when her shoulders were sore from the repetitive work she performed.

As of the date of the hearing, Claimant had continuing pain in the lower right side of her back, in her right hip and in her right leg and knee. She also related she continues to be unable to lift anything heavier than a gallon of milk. Claimant stated she cannot squat or bend; stand for long periods of time; sit for more than thirty minutes; walk farther than fifty to seventy-five feet; walk without a cane; do house work, yard work, or go fishing; and, cannot mentally concentrate on tasks. She related that without her medication she is in "terrible" pain and limps when she walks. Claimant stated that her doctors have neither been able to isolate the pain she is having nor have they been able to pinpoint an exact cause for her pain.

Claimant's husband, James Russell, confirmed much of what Claimant testified to. He also related that since the accident he has had to take over the household chores and that his wife cannot perform heavy lifting tasks or go grocery shopping. He further stated that Claimant is consistently on pain medication.

Dr. Walker's deposition was received into evidence by the ALJ. He testified that upon first examination he believed Claimant had degenerative issues with some of her vertebrae as well as some problems with arthritis. He related he tried to correlate Claimant's pattern of pain in her lower back with the symptoms she was physically exhibiting with her MRI and x-rays results, but that he was unable to come to a definitive answer as to the source of Claimant's pain. He stated that she did walk with a "gait that you would see with someone with back pain, sort of a somewhat hunched posture, stiff movement of her trunk when she would turn side to side ... a stiff posture;" however, Dr. Walker stated he never saw Claimant limp. It was his belief that the only treatment which had alleviated Claimant's pain had been the use of narcotic drugs and he thought she might use medication to control her pain for an indefinite period of time.

Dr. Walker did not believe Claimant over-exaggerated her pain or symptoms and in his experience he had not seen anything in Claimant's "behavior that would make [him] think she's a pain magnifier." He also related that "[t]he indications I see in conversing with her and evaluating her from an orthopedic standpoint, I don't see any of that that jumps out at me and says there is a big psychosomatic problem here with this patient." Although Dr. Walker did not recommend Claimant seek psychiatric testing, he did assert that it could be beneficial in analyzing her pain.

Dr. Walker ultimately opined that he did not think Claimant could return to her previous employment or other work outside the home due to her pain and discomfort. He related "[Claimant] is disabled at this point from gainful employment" and acknowledged that Claimant was totally disabled.

On January 6, 2003, Employer had Claimant examined by Dr. Norbert Belz, whose deposition testimony was also received into evidence. Dr. Belz, who specializes in "occupational and environmental medicine," found Claimant failed all of the Waddell's tests he performed on her and that her reactions were inconsistent.[1] He noted Claimant gave "very graphic and exaggerated pain responses, grunting groaning," during the Waddell's testing and there was "[n]o anatomic cause" for her responses.

Dr. Belz also testified that he believed Claimant may have damaged her lateral femoral cutaneous nerve and that such damage often occurs in people who are obese, but that the nerve could also have been damaged in the fall. He stated that findings such as those he made on Claimant "are associated with a number of conditions, including malingering." He also noted "significant inconsistencies" in the history of pain and activity levels Claimant reported to him. He related Claimant's limp was "bizarre and inconsistent;" was "exaggerated;" and, changed "markedly" during the course of his examination. However, on cross-examination, Dr. Belz acknowledged that in his medical report he had never reported Claimant as being a malingerer, and acknowledged that nowhere in his medical report had he set out that Claimant was motivated for pecuniary reasons to exaggerate her symptoms.

Dr. Belz also found Claimant's cervical range of motion was reduced, but that her back was "working pretty well" and he observed no spasms in her muscles. Additionally, Dr. Belz stated that he believed

1. As more fully explained in the testimony of Dr. Koprivica, Waddell's tests look for re- sponses from a patient that are not explainable on a physical basis.

Claimant's knee problems were not related to her fall, but were, instead, from arthritis which existed prior to the fall. Dr. Belz did relate that Claimant had "a lumbosacral sprain/strain and that will produce some symptoms."

Dr. Belz concluded Claimant was able to return to her job with Employer and that, in fact, her previous position with Employer "was well within her capabilities" and "ideally designed" for someone with her physical capacity. He gave her back a permanent partial disability rating of between five and seven percent of her body as a whole and her hip a permanent partial disability rating of two and one half percent of her body as a whole.

The deposition of Dr. Brent Koprivica, an occupational physician, was also received into evidence. Dr. Koprivica had examined Claimant on January 15, 2002, and performed an MRI, provocative discography, and other testing. He was unable to pinpoint the source of Claimant's pain. He observed Claimant was morbidly obese (defined in the record as being 100 pounds or more overweight); avoided putting her weight on her right leg; limped with an "antalgic gait;" appeared to be uncomfortable when she was sitting; walked with a shuffle "and profound limp;" and, was unable to squat.[2] Dr. Koprivica opined that:

> [p]rognostically the response to a back injury in an individual who is morbidly obese is poor. Part of the problem is the fact that the spine is a structure that has to absorb all the forces of your body weight plus any other activity that you do in activities of daily living that would be added on to it, so if you started out with a higher amount of stress on the spine from being overweight and then you add to that person's trying to do

activity like lifting and carrying, it's much more difficult for that individual to recover and carry on than someone who is of normal body weight.

When asked his opinion of what happened physiologically as a result of the accident, Dr. Koprivica related that:

> Physiologically I believe that she put stresses on her back due to her size and the forces of the fall that resulted in a likely soft tissue type injury. Ligament and muscle. I don't believe that it's disc source for her pain generator with the workup that's been done and we see individuals who have chronic back pain that don't have disc herniation, don't have anything significant on their MRI scan who continue to have chronic pain. If you take all individuals who have soft tissue injuries, one to two percent of them will develop chronic problems and those individuals can have ongoing pain the rest of their life that's quite disabling. In her case, I felt that her size would be a negative problem, or negative consideration to start out with because there's going to be more force involved with a fall.

Dr. Koprivica also related he performed a series of "Waddell's signs" on Claimant. He explained that Waddell's signs are a series of tests used to inform a physician "whether or not there is a significant psychological dysfunction in the person in their presentation." He stated the "tests themselves, what they're looking for are responses that are not explainable on a physical basis."

According to Dr. Koprivica, Claimant "overreacted" on three or four out of the five Waddell's categories. He related such overreactions led him to believe that Claimant's physical complaints had at least some psychological components. Howev-

2. The record shows Claimant weighed in the range of 250 to 260 pounds.

er, Dr. Koprivica stated, "I've read reports in other cases where [such results] get[ ] interpreted that she's malingering and my opinion is that you can't come to that kind of a conclusion [here]." He related that "you can have—if a person is distressed psychologically, to relieve that distress, they have pain behaviors. That's different than a conscious attempt to deceive or malinger. . . ." He further explained that:

Waddell's test [sic] don't tell you if it's subconscious or conscious. All it tells you is that there are these abnormal psychological responses and [in] Dr. Waddell's writings, he said that his observations were that these people had true psychological dysfunction, the majority of them, that they didn't consciously control the responses and it correlated with their psychological profile testing.

Dr. Koprivica also stated that:

a person can also have psychological distress, and this is in our social environment, that's the way the people deal with pain and the psychiatric distress they're having is to complain of pain and that's—I view that differently than I do deception and malingering. They're both secondary gain, but they're different. The statistics on all this is that a majority of patients are—it's on a subconscious basis. It's not consciously controlled . . . and what you need factually to say that it is malingering or deception, would be observations that would clearly indicate that she had knowledge and she's lying to you.

While Dr. Koprivica conceded he could not eliminate the *possibility* that Claimant may have been malingering, he also observed that:

I look at the statistical considerations in terms of which is more likely, I also look at other observations and I think I mention them in my report and her repre-sentation to me was that she had a good work record, had not had prior problems, that kind of thing. Those things I look at. People who have had similar behaviors in the past where they're missing work all the time, they're having legal problems, those tend to be people that are more likely to malinger and I look at that for clues, but again, nothing is absolute on this.

Significantly, when asked what his opinion was about the disability caused by the accident, Dr. Koprivica responded, "[m]y opinion is that she's totally disabled based on this injury."

In her Findings of Fact and Conclusions of Law, the ALJ determined, *inter alia*, that Claimant had fallen in Employer's parking lot at a time and place when it was reasonably necessary to be in the service of Employer. She further determined that Claimant "suffered a permanent partial disability of [fifteen] percent to the body as a whole." However, the ALJ concluded Claimant would not "require future medical care to cure and relieve the effects of [her] injuries."

Claimant duly filed an Application for Review with the Commission. The Commission entered its "Final Award Allowing Compensation" and modified the ALJ's award. In its Final Award, the Commission determined, *inter alia*, that the ALJ "erred in not granting future medical benefits" to Claimant and erred "in failing to award [Claimant] permanent and total compensation." The Commission also recognized that "[t]he medical evidence is divided concerning the effects of [Claimant's] injury," and expressly found the testimonies of Claimant's professional experts, Doctors Walker and Koprivica, were more credible than that of Dr. Belz, Appellants' expert. Accordingly, the Commission determined that "no employer, in the ordinary course of business,

would employ [Claimant] in her present state of health" and found that Claimant was "entitled to permanent and total disability benefits at the rate of $290.74 per week...."[3] The Commission also found that Claimant "is in need of continuing medical evaluation, treatment and medication in an effort to cure and relieve her from the effect of this injury as required by statute."[4] This appeal followed.

In reviewing a workers' compensation award, we review the findings of the Commission and not those of the ALJ. *Clark v. FAG Bearings Corp.*, 134 S.W.3d 730, 734 (Mo.App.2004). "The Commission reviews the record, and, where appropriate, it will also determine the credibility of witnesses and the weight of their testimony, resolve any conflicts in the evidence, and reach its conclusions on factual issues *independent* of the ALJ." *Shaw v. Scott*, 49 S.W.3d 720, 728 (Mo.App.2001). The "Commission's interpretation and application of the law ... are not binding on this [C]ourt and fall within our realm of independent review and correction." *Bowers v. Hiland Dairy Co.*, 132 S.W.3d 260, 263 (Mo.App.2004).

"We 'may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other: (1)[t]hat the [C]ommission acted without or in excess of its powers; (2)[t]hat the award was procured by fraud; (3)[t]hat the facts found by the [C]ommission do not support the award; and (4)[t]hat there was not sufficient competent evidence in the record to warrant the making of the award.'" *Shelton v. Missouri Baptist Med. Ctr.*, 42 S.W.3d 700, 701 (Mo.App.2001) (quoting § 287.495.1).

In *Hampton v. Big Boy Steel Erection*, 121 S.W.3d at 222–23, the Supreme Court of Missouri set out that a "court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." Stated another way, if an award is contrary to the overwhelming weight of the evidence, then it is not supported by competent and substantial evidence. *Id.*

In their first point on appeal, Appellants maintain the Commission erred in modifying the award of the ALJ by finding Claimant to be permanently and totally disabled, as well as by determining Claimant required future medical care and treatment.[5] Specifically, Appellants assert the

---

3.  " 'Total disability' is defined as the inability to return to any employment and not merely the inability to return to the employment in which the employee was engaged at the time of the accident." *Sullivan v. Masters Jackson Paving Co.*, 35 S.W.3d 879, 884 (Mo.App. 2001) (*overruled on other grounds by Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003)); *see also* § 287.020.7. "The test for permanent total disability is the worker's ability to compete in the open labor market in that it measures the worker's potential for returning to employment." *Sutton v. Vee Jay Cement Contracting Co.*, 37 S.W.3d 803, 811 (Mo.App.2000); *see also* § 287.200.

Statutory references are to RSMo 2000, unless otherwise set out.

4.  *See* § 287.140.

5.  While Appellants' first point relied on asserts the Commission also erred in "requiring future medical care because the Commission's award is not supported by substantial and competent evidence ...," in the argument portion of their brief Appellants fail to address this contention. In fact, Appellants mention future medical care only twice in the body of their argument and both times it is merely in passing. " 'An appellant must develop the contention raised in the point relied on in the argument section of the brief.' " *Weisenburger v. City of St. Joseph*, 51 S.W.3d 119, 124 (Mo.App.2001) (quoting *Luft v. Schoenhoff*, 935 S.W.2d 685, 687 (Mo.App.1996)). "Arguments raised in the points relied on that

Commission's award was not supported by substantial and competent evidence in that "the overwhelming evidence presented in the record as a whole demonstrates that [Claimant] exaggerated or misrepresented her symptoms ...;" that there was no evidence in the record that there were physiological or psychological causes for Claimant's pain so "the only possible explanation for [her] pain" was malingering; that the Commission failed to consider the credibility determinations of the ALJ; and, that "there has never been one scintilla of objective evidence presented that supports [Claimant's] claims of pain...."

■ As previously related, on issues involving the credibility of witnesses and the proper weight to be given their testimony, we defer to the Commission. *Birdsong v. Waste Mgmt.*, 147 S.W.3d 132, 137 (Mo. App.2004); *see also Clark*, 134 S.W.3d at 735. Additionally, "[w]hen witnesses are deposed and do not testify live before the ALJ, the Commission is just as able as the ALJ to determine credibility from the written record." *Birdsong*, 147 S.W.3d at 137–38. "In situations where witnesses are deposed and do not testify live before the ALJ, this [C]ourt defers to the Commission on matters such as witness credibility, as the Commission is just as able as the ALJ to determine credibility from the written record." *Aldridge v. S. Missouri Gas Co.*, 131 S.W.3d 876, 880 (Mo.App. 2004).

Here, the Commission determined that "[t]he medical evidence is divided concerning the effects of [Claimant's] injury." It further recited that "Dr. Walker testified that [Claimant] is permanently disabled and unable to work in the open labor market because of her pain. Dr. Walker has treated [Claimant] since the injury." The

Commission also set out that Dr. Koprivica found Claimant was "totally disabled as the result of her work injury." However, the Commission chose not to accept the opinion of Dr. Belz that Claimant had but a "small disability because of a lumbar sprain" and "could work and did not need any present nor future medical attention." Rather, the Commission accepted the testimonies of Doctors Walker and Koprivica as credible and found that "based on our review of the evidence, both lay and expert, [Claimant] is totally disabled. We find [Claimant] credible and believe her complaints of injury related, intractable pain."

■ "The acceptance or rejection of medical evidence is for the Commission." *Sullivan*, 35 S.W.3d at 884. "The fact finder may reject all or part of an expert's testimony." *Bennett v. Columbia Health Care*, 134 S.W.3d 84, 92 (Mo.App.2004). We will uphold the Commission's "decision to accept one of two conflicting medical opinions" if such a finding is supported by competent and substantial evidence. *Birdsong*, 147 S.W.3d at 140. "We will not overturn [the Commission's] determination regarding conflicting medical opinions, unless it is against the overwhelming weight of the evidence." *Bennett*, 134 S.W.3d at 92.

It is our observation that Claimant's complaints of pain and her inability to perform certain tasks were supported by the medical testimony of both Dr. Walker and Dr. Koprivica, as previously outlined.

■ In addition to what has previously been said about Dr. Walker's medical testimony, he also opined that "[p]hysiologically, there is something contributing

are not supported by argument in the argument portion of the brief are deemed abandoned and present nothing for appellate re-

view." *Id.* As such, we do not address that allegation in this opinion.

to her pain. . . ." He related that Claimant suffered from "some disorder affecting the sacroiliac joint. And I think that that's an objective finding." Dr. Walker further testified, based in part on his presumption of truthfulness as to Claimant's complaints, that

[w]hen you find tenderness that's specifically isolated to that area, that this is an objective finding that, yes, there is some disorder in that area of the sacroiliac joint. And she also had tenderness at the lumbosacral junction, which would also be an objective finding that, yes, there is some disorder here of the muscles, ligament, tendons, something like that.

" 'A physician, in stating his expert opinion on a patient's condition, may testify to what he personally observed and also to what the patient said . . . concerning his present, existing symptoms and complaints.' " *Kerns v. Midwest Conveyor,* 126 S.W.3d 445, 452 (Mo.App.2004) (quoting *Davies v. Carter Carburetor,* 429 S.W.2d 738, 751 (Mo.1968)). "The 'testimony of the claimant or other lay witnesses as to facts within the realm of lay understanding can constitute substantial evidence of the nature, cause, and extent of the disability, especially when taken in connection with, or where supported by, some medical evidence.' " *Avery v. City of Columbia,* 966 S.W.2d 315, 323 (Mo.App. 1998) (quoting *Eimer v. Bd. of Police Comm'rs,* 895 S.W.2d 117, 120 (Mo.App. 1995)).

Similar to Dr. Koprivica's observations, Dr. Walker also observed that "I believe there are cases like [Claimant's] where you cannot identify a specific lesion or a specif-

ic anatomic part that's causing the pain, but they still do have pain. And where the pain comes from, we don't know." He explained that "there are those who have chronic pain that are disabled because of the pain. But just because someone has chronic pain, doesn't make them a malingerer." Dr. Walker also related that "that's why we see so much emphasis now on chronic pain management centers, because there are a lot of people who have these problems like this." Dr. Walker also testified he "would have to say with a degree of medical certainty that this fall was her probable cause of the back pain she has now," and that "she is disabled at this point from gainful employment."

The testimonies of Doctors Walker and Koprivica, as well as that of Claimant herself, constituted competent and substantial evidence upon which the Commission could rely in concluding Claimant was permanently and totally disabled as a result of her fall in Employer's parking lot.[6] *See Avery,* 966 S.W.2d at 323. "[T]he expert medical evidence relied upon by the Commission to find that [Claimant] was permanently and totally disabled was competent on that issue." *Kerns,* 126 S.W.3d at 452. Point One is denied.

Appellants' second point on appeal maintains the Commission erred in "refusing to consider or find credible the opinions and testimony of Dr. Norbert Belz." Appellants assert the Commission's failure to consider Dr. Belz's testimony results in an award that is not only contradictory but based on the incomplete and subjective opinions of Claimant's witnesses.

---

6. We also note that no objection was posed by Appellants to the testimony of either Dr. Walker or Dr. Koprivica during their respective depositions, based on the lack of objective test results preliminary to each physician's determination that Claimant was permanently and totally disabled. It is our view, in either event, that Appellants have waived this issue. *See Hawthorne v. Lester E. Cox Medical Centers,* 165 S.W.3d 587, 593 (Mo.App.2005); *see also Seabaugh v. Milde Farms, Inc.,* 816 S.W.2d 202, 209 (Mo. banc 1991).

This point appears to be a reiteration of Point One. It is not clear how Appellants have concluded that the Commission failed to *consider* Dr. Belz's testimony. The Commission observed that Appellants "improperly tainted the independence of the opinion [expressed by Dr. Belz's in his medical report], by providing negative characterizations of [Claimant's] deposition testimony, [and that Dr. Belz] was advised that, in the opinion of referring counsel, [Claimant's] demeanor indicated obvious malingering or fraud." Therefore, it is clear the Commission expressly considered Dr. Belz's testimony but rejected it. "This [c]ourt defers to the Commission with regard to credibility determinations of deposition testimony." *Clark,* 134 S.W.3d at 735.

 The record clearly reveals the Commission reviewed the deposition testimony provided by each of the three expert witnesses in this matter, specifically expressing its preference for the testimonies of Dr. Walker and Dr. Koprivica and its disapproval of Dr. Belz's findings. As all of the expert testimony was received by deposition, the Commission was just as able as the ALJ to determine the credibility of deposed witnesses from the written record. *Birdsong,* 147 S.W.3d at 140. Additionally, as previously set out, " '[t]he decision to accept one of two conflicting medical opinions is a question of fact for the Commission.' " *Id.* (citation omitted). "It is in the Commission's sole discretion to determine the weight to be given expert opinions." *Negri v. Continental Sales & Service,* 139 S.W.3d 565, 569 (Mo.App. 2004). The Commission as fact finder may reject all or part of an expert's testimony. *Bennett,* 134 S.W.3d at 92.

The Commission's decision to defer to the findings of Dr. Walker and Dr. Koprivica as opposed to the findings of Dr. Belz was not an abuse of discretion and was within its province. *Bennett,* 134 S.W.3d at 92. The testimony of Drs. Walker and Koprivica constituted substantial, competent and credible medical testimony that Claimant was permanently and totally disabled as a result of her accidental fall at work. Appellants' second point is denied.

Based on our review of the whole record, the Commission's award was supported by substantial and competent evidence and, accordingly, was not against the overwhelming weight of the evidence. The decision of the Commission is affirmed.

The Final Award of the Commission is affirmed.

SHRUM, P.J., and GARRISON, J., concur.