Gary L. ADAMSON, Appellant,

v.

**DTC CALHOUN TRUCKING, INC., Respondent,**

and

**The Second Injury Fund, Respondent.**

No. 27651.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 30, 2007.

208

Paul F. Reichert, Margaret A. Schlachter, Springfield, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cara Lee Harris, Asst. Atty. Gen., Jefferson City, for Second Injury Fund.

Raymond E. Whiteaker, Springfield, for respondent.

ROBERT S. BARNEY, Judge.

Appellant Gary L. Adamson ("Claimant") appeals from the final award of the Labor and Industrial Relations Commission ("the Commission") affirming the award and decision of the Administrative Law Judge ("ALJ") regarding Claimant's request for worker's compensation disability benefits based on occupational injuries suffered on or about February 17, 2003, while working for DTC Calhoun Trucking Company ("Employer").[1] In his two points on appeal, Claimant takes umbrage with the formula used by the Commission to calculate his wages under section 287.250.1 for the purposes of temporary total disability ("TTD") compensation and the evidentiary determination of "the nature and extent of [his] disability...."[2]

The record reveals that at the time of his injury on February 17, 2003, Claimant was sixty-one years old and had been employed with Employer for four years. Claimant worked for Employer hauling sand and aggregate to Springfield, Missouri, from Jefferson City, Missouri. Claimant drove a large truck with a "pup trailer" behind it and typically made two trips to Jefferson City per day.

On February 17, 2003, Claimant injured his lower back when he was attempting to secure a tarp on the top of his truck and he fell backwards off the truck, landing hard on the ground below.[3] After the fall, Claimant was able to drive his truck back to Springfield and he reported the accident to Employer. Claimant did not ask to see a physician at that time because he assumed the pain in his lower back would subside and he would "g[e]t over it." He continued to work after the accident but experienced some difficulty in performing his job.[4]

Several weeks later, on March 6, 2003, Claimant was instructed by Employer to obtain a physical from Dr. Melvin Curry ("Dr. Curry") for purposes of maintaining his Department of Transportation ("DOT") "health card." He was still experiencing symptoms relating to his fall from the truck, but he did not report these symptoms to Dr. Curry, because, as he testified, he "had to work" and needed to pass the physical in order to keep his DOT credentials.

On March 14, 2003, Claimant informed Employer that he was still experiencing problems and he needed to see a physician. Employer asked him to return to Dr. Curry, but Claimant insisted on going to the

---

1. We note that in the present matter the Commission found "no Second Injury Fund liability" and neither of Claimant's points relied on are directed against that finding; accordingly, it will not be discussed in this opinion.

2. All statutory references are to RSMo 2000.

3. The parties in this matter stipulated that Claimant was in fact injured "in the course and scope of employment" and that he "noti-

fied [ ] [E]mployer of his injury as required by [s]ection 287.420...." Accordingly, there is no need to detail the specifics of how Claimant was injured.

4. After the accident on February 17, 2003, Claimant drove a truck for Employer a total of 39.75 hours from February 18–21, 2003. Thereafter, Claimant drove 76.75 hours in the month of March of 2003.

emergency room at St. John's Hospital. At the emergency room, Claimant saw Dr. Mark Newport ("Dr. Newport") who prescribed muscle relaxants for Claimant. Dr. Newport "thought [Claimant] had a possible hernia." Dr. Newport then referred Claimant to Dr. James Jordan ("Dr. Jordan"), an occupational medicine specialist.

On March 18, 2003, Dr. Jordan gave Claimant several epidural steroid injections in his lumbar spine and examined a large knot Claimant had developed on his right side in the groin area, which Dr. Jordan diagnosed as a femoral hernia. In examining Claimant's MRI results, Dr. Jordan found "degenerative disc bulges with annular tears at L3–4, L4–5, and L5–S1 . . . ." Dr. Jordan referred Claimant for physical therapy and also referred him to Dr. Nicholas Shoults ("Dr. Shoults") for treatment of his hernia.

Dr. Shoults examined Claimant for a femoral hernia on March 21, 2003, and then repaired Claimant's hernia on March 24, 2003. Claimant testified at his hearing that the hernia no longer bothered him.

The record also reveals that Claimant received epidural steroid injections in his lower back from Dr. Benjamin Lampert ("Dr. Lampert"), a pain management specialist, on May 7, 2003; May 14, 2003; May 29, 2003; and June 12, 2003. Dr. Lampert noted on May 7, 2003, that Claimant reports his pain is "about 60 [percent] in his back and 40 [percent] in his legs . . ." and his MRI "reveals significant 3–level degenerative disc disease."

On June 19, 2003, Claimant saw Dr. Fred McQueary ("Dr. McQueary"), an orthopedic spine specialist, who reported Claimant's "MRI scan of the low back done on April 23, 2003 was reviewed . . . [t]here is disk desiccation and mild narrowing indicating disk degeneration is present at L3–4, L4–5, and L5–S1." Dr. McQueary notes also that Claimant "has

job related sprain injury overlying this . . . I feel that his chance of returning to the same line of work is quite slim."

On July 29, 2003, Dr. Jordan's report noted Claimant "[h]as some good days. Still having lots of pain in low back and down into leg." Dr. Jordan also related that Claimant reported to him that "he can sit and walk in yard;" " '[t]he only yard work [he does] is watering flowers;' " he can "sit on the riding lawn mower for 15 minutes" then he has to " 'lay down for 1 [hour] to 1 [hour] 15 minutes after 4 to 4½ hours;' " he " 'builds bird houses;' " and he " 'can drive in the car only 30 minutes without stopping.' " Dr. Jordan released him from treatment at that time without any limitations or restrictions.

At the time of the hearing, Claimant testified that his left leg tingles and "goes to sleep;" "[i]f [he] sit[s] or stand[s], [his] back just goes to pieces;" he must lay down around 11:00 a.m. every day because of uncomfortable back pain; and he has good days and bad days with his pain level. Claimant stated he is able to "do a little garden work;" he can run errands and complete other simple tasks; he does his "own cleaning and grocery shopping" and "laundry;" and has been deer hunting on one occasion since the accident. Claimant testified that he did not believe he could work as a dispatcher for Employer because he did not "believe [he has] the patience anymore from the pain all the time to put up with people on the telephone" and he must lie down occasionally during the day.

Claimant offered into evidence the testimony and report of Wilbur Swearingin ("Mr. Swearingin"), a rehabilitation counselor, who evaluated Claimant "in regard to his potential for employment in the open labor market." Mr. Swearingin testified that given Claimant's medical restrictions and hearing loss, he felt Claimant had no

transferable skills and that "in consideration of his education, his advanced age, and his history of moderate to heavy manual work ... [Claimant] is neither employable nor placeable in the open labor market."

Claimant also offered into evidence the testimony, deposition, and report of Dr. Norbert Belz ("Dr. Belz"), who performed an independent medical evaluation of Claimant. Dr. Belz testified that Claimant's situation was "more complex because there were some significant prior disabilities ... [a]nd then it became even more complicated because there were some substantial subsequent medical events that befell [Claimant]." In his evaluation of Claimant, Dr. Belz concluded Claimant had "rather significant hearing loss;" "had very significant injuries to three levels of his back;" had "tears in the annulus fibrosis at three levels ... L3–4, L4–5, L5–S1" which appeared to him to be inoperable; had "sustained radiculopathies—two on the left, one on the right;" "as a result of this axial load [injury, Claimant] had forces generated intra-abdominally which blew out a hernia in the right femoral area;" and he had also injured his sciatic nerve. Dr. Belz testified that the three annular tears as well as some "bilateral lower extremity radiculopathies" were the result of Claimant's fall on February 17, 2003. Dr. Belz felt Claimant had reached his maximum medical benefit and would be "best served by the medication regime he is on ... [a]nd he is best treated by activity modification, as opposed to more narcotic medications or surgical intervention." Dr. Belz concluded that Claimant needs to lie down several hours a day to alleviate his pain; that such a restriction "would render an individual permanently and totally disabled;" and that he would be unable to compete in the open labor market.

Dr. Belz also noted Claimant is able to cut his own firewood; has been deer hunting "with a .45 caliber muzzleloader;" and can lift and carry at least twenty-five pounds. Dr. Belz also related that he had observed "degenerative changes" in Claimant's "lumbosacral spine;" that some of the changes he observed had been "ongoing for a number of years;" and that he believed there had been an aggravation of these degenerative conditions. Dr. Belz determined that Claimant suffered "[b]etween seven and one-half and ten percent ... permanent partial disability to the body as a whole ..." due to the "rather significant degenerative changes of the low back ..." which were aggravated by the occupational injury of February 17, 2003.

Dr. Belz also determined Claimant suffered a fifteen percent permanent partial disability "to the left lower extremity at the level of the left hip ..." due to his "[l]eft sciatic nerve contusion with paresthesias and pain...." Dr. Belz concluded that Claimant was at maximum medical improvement on April 27, 2004, and that Claimant "has sustained a twenty-five percent ... permanent partial disability to the body as a whole ..." as a result of his "[o]ccupational aggravation of prior degenerative joint disease and degenerative disc disease lumbosacral spine." Dr. Belz also noted that Claimant should "not ... lift/push/pull in excess of 25 pounds;" that Claimant should "recline during any eight-hour work shift for one hour ...;" and that Claimant "is not to operate a dump truck."

Employer offered the deposition of Dr. Jordan into evidence. Dr. Jordan testified at deposition that initially Claimant did not complain of any previous back problems, but that his MRI revealed the degenerative disc problems which pre-existed his February 17, 2003, injury. Dr. Jordan stated that Claimant had "fully recovered" from the femoral hernia "[a]nd actually there's no impairment and really no disability" relating to the hernia repair. He stated that there was nothing in his physi-

cal exam of Claimant which would lead him to believe Claimant needed to lie down occasionally during the day, but that Claimant had reported to Dr. Jordan that he had to lie down every four hours.

Dr. Jordan testified that he found Claimant was one percent disabled to the body as a whole "for the femoral hernia repair" and that Claimant was eight percent disabled as to "the whole person, which would be 400–week level, with 50 percent of that ... attributable to the preexisting degenerative dis[c] disease." In his report, Dr. Jordan also assessed a two percent "disability rating at the 400–week level for [Claimant's] continued pain in the lumbar spine that is fully attributable to the workers' compensation claim."

Employer also tendered the deposition of Dr. Curry into evidence. Dr. Curry stated in his deposition that when he examined Claimant for a work-related physical on March 6, 2003, a few weeks after his injury, Claimant reported "no problems" with his back or any of his extremities and denied having any chronic lower back pain.

Employer and Claimant both offered a surveillance video of Claimant into evidence which showed Claimant building a garden wall out of large stones. Dr. Belz noted that he saw nothing in the videotape which would "contradict ... [his] objective findings or [Claimant's] subjective complaints." In his deposition testimony, Dr. Jordan stated that Claimant's actions on the videotape were not consistent with the physical complaints Claimant had reported to him and that, if had he seen the videotape prior to issuing his report, he would have lowered his disability ratings on Claimant.

Following the hearing, the ALJ found Claimant had received TTD underpayment of $39.40; that Claimant "sustained a permanent partial disability of 12.5 percent to the body as a whole ... referable to the low back and femoral hernia;" that Claimant was entitled to the total sum of $17,006.00 in permanent partial disability for the injuries he suffered on February 17, 2003; that there was no Second Injury Fund liability; that Claimant was not entitled to future medical care; and that Employer was not liable for a statutory penalty under section 287.120.4.

Claimant filed his application for review with the Commission on August 22, 2005. On March 2, 2006, the Commission issued its final award and incorporated the award and decision of the ALJ. This appeal by Claimant followed.

■ When reviewing the decision of the Commission in workers' compensation cases

> [w]e 'may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other: (1)[t]hat the commission acted without or in excess of its powers; (2)[t]hat the award was procured by fraud; (3)[t]hat the facts found by the commission do not support the award; and (4)[t]hat there was not sufficient competent evidence in the record to warrant the making of the award.'

*Shelton v. Missouri Baptist Med. Ctr.*, 42 S.W.3d 700, 701 (Mo.App.2001) (quoting § 287.495.1). In *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003), the Supreme Court of Missouri set out that "[a] court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." [5] Stat-

---

5. We note several cases overruled by *Hampton*, to the extent they are in conflict with the holding therein, are cited in this opinion in support of other principles of law not affected by the *Hampton* ruling. *Id.* at 224–32. No further acknowledgment of *Hampton's* effect on those cases needs to be recited hereafter.

ed another way, if an award is contrary to the overwhelming weight of the evidence, then it is not supported by competent and substantial evidence. *Id.* at 223. We do not view the evidence in the light most favorable to the award. *Id.*

■ Generally, in reviewing a workers' compensation award, "we review the findings of the Commission and not those of the ALJ." *Clark v. FAG Bearings Corp.,* 134 S.W.3d 730, 734 (Mo.App.2004). However, if, as in the present matter, "the Commission incorporates the ALJ's award and decisions ... we consider the findings and conclusions of the Commission as including the ALJ's award." *Martinez v. Nationwide Paper,* 168 S.W.3d 566, 568 (Mo.App.2005). "The Commission reviews the record, and, where appropriate, it will also determine the credibility of witnesses and the weight of their testimony, resolve any conflicts in the evidence, and reach its own conclusions on factual issues *independent* of the ALJ." *Shaw v. Scott,* 49 S.W.3d 720, 728 (Mo.App.2001). "The Commission's interpretation and application of the law ... are not binding on this [C]ourt and fall within our realm of independent review and correction." *Bowers v. Hiland Dairy Co.,* 132 S.W.3d 260, 263 (Mo.App.2004).

In his first point on appeal, Claimant asserts the Commission erred in affirming the ALJ's determination regarding the amount of his average weekly wages for purposes of his TTD compensation. Specifically, Claimant asserts that the formula set out in section 287.250.1(4), which relates to wages "fixed by the day, hour, or by the output of the employee ...," should not have been used in his situation because his "earnings were based upon the needs of ... Employer and determined by calculating a percentage of the variable gross

revenue derived from [Claimant's] load." He maintains the Commission should have used the calculation set out in section 287.250.4 relating to situations in which "the average weekly wage cannot fairly and justly be determined by the formulas provided in subsections 1 to 3 of this section...." § 287.250.4.

■ In our analysis, we initially observe that Claimant bears the burden of proving all material elements of his claim, including the proper compensation rate for TTD benefits. *Seeley v. Anchor Fence Co.,* 96 S.W.3d 809, 821 (Mo.App.2002).

■ In determining the applicable weekly wage rate under section 287.250 "'[i]t is necessary to commence with the first subsection and then to descend in numerical order under the other subsections until the wage rate provision is found that applies to the particular facts of the case.'"[6] *Stegeman v. St. Francis Xavier Parish,* 611 S.W.2d 204, 210 (Mo. banc 1981) (citation omitted). Section 287.250 sets out in pertinent part:

1. Except as otherwise provided for in this chapter, the method of computing an injured employee's average weekly earnings which will serve as the basis for compensation provided for in this chapter shall be as follows:

(1) If the wages are fixed by the week, the amount so fixed shall be the average weekly wage;

(2) If the wages are fixed by the month, the average weekly wage shall be the monthly wage so fixed multiplied by twelve and divided by fifty-two;

(3) If the wages are fixed by the year, the average weekly wage shall be the yearly wage fixed divided by fifty-two;

---

6. While *Stegeman* was decided under a previous version of section 287.250, the aforementioned approach is still followed in relation to the current version of section 287.250. *See*

*Seiferd v. Distinctive Service and Sign Erection, Inc.,* 965 S.W.2d 410, 412 (Mo.App. 1998).

(4) If the wages were fixed by the day, hour, or by the output of the employee, the average weekly wage shall be computed by dividing by thirteen the wages earned while actually employed by the employer in each of the last thirteen calendar weeks immediately preceding the week in which the employee was injured.... For purposes of computing the average weekly wage pursuant to this subdivision, absence of five regular or scheduled work days, even if not in the same calendar week, shall be considered as absence for a calendar week.

* * *

(6) If the hourly wage has not been fixed or cannot be ascertained, or the employee earned no wage, the wage for the purpose of calculating compensation shall be taken to be the usual wage for similar services where such services are rendered by paid employees of the employer or any other employer;

* * *

4. If pursuant to this section the average weekly wage cannot fairly and justly be determined by the formulas provided in subsections 1 to 3 of this section, the division or the [C]ommission may determine the average weekly wage in such manner and by such method as, in the opinion of the division or the commission, based upon the exceptional facts presented, fairly determine such employee's average weekly wage.

In the present matter, Claimant testified he hauled sand and aggregate to Springfield, Missouri, from Jefferson City, Missouri, for Employer and that he did so based on Employer's varying need for sand and aggregate. Claimant testified that he received "weekly pay stubs" from Employer and was paid 30 percent "[o]f what [Employer's] truck grossed ..." on each trip from Springfield to Jefferson City. Claimant stated he typically "worked 60 hours a week, primarily working 12 hours a day, Monday through Friday...." He also stated he generally worked "a full week" in the summer and that the work was slower in the winter.

Based on the foregoing evidence, the Commission determined the requisite rate at which Claimant's TTD was to be compensated based on section 287.250.1(4) dealing with wages which are fixed "by the output of the employee." It determined that

[i]n the present case, as an employee of [Employer], [Claimant] worked as a nonunion driver and earned wages based on a percentage of 'what the truck grossed.' According to [Claimant], he earned 30 percent of the gross revenue per haul. The pay stubs ... which govern the applicable 13-week period, indicate that [Claimant] earned an average weekly wage of $595.30. (7,738.92 divided by 13 = $595.30.)

The Commission also set out that

[n]otably, during this 13-week period, there are a number of days [Claimant] did not work. However, [Employer] did not provide [Claimant] with a predetermined work schedule. Rather, [Claimant] worked according to [Employer's] needs, which was determined day by day. Accordingly, there is not an absence of five regular or scheduled workdays (or absence of a calendar week), and thus no basis for reducing or not considering the workweeks [Claimant] earned a substantially lower wage....

Accordingly, after consideration and review of the evidence, [we] find and conclude that, at the time of the accident of February 17, 2003, [Claimant's] average weekly wage was $595.30. Therefore, the applicable compensation rate is $396.87 for the purpose of [TTD] compensation, and a compensation rate of

$340.12 for the purpose of permanent partial disability compensation.[7]

■ In determining whether Claimant's wages "were fixed ... by the output of the employee" as stated in section 287.250.1(4) for purposes of his TTD calculation, we observe the phrase "output of the employee" has yet to be defined in the State of Missouri. As such, we turn to other jurisdictions for guidance. It has been stated by the Nebraska Supreme Court that "an employee whose compensation is based on output" is defined as "an employee whose pay depends upon his capacity, skill, or good fortune." *Loeffelholz v. Allied Mutual Ins. Co.*, 183 Neb. 112, 158 N.W.2d 219, 221 (1968). In the present matter, Claimant's wages were based upon Employer's good fortune in how many orders it received for sand; how often it sent Claimant to collect that sand; and how much money it was able to collect for that sand. Likewise, Claimant was paid a percentage "[o]f what [Employer's] truck grossed ..." based on his skill and capacity in getting the sand back and forth from Jefferson City to Springfield. There is no doubt in the present matter Claimant's wages were based upon his output and, thus, his wages for purposes of TTD compensation were properly calculated under the formulae set out in section 287.250.1(4).[8]

As stated above, in calculating TTD compensation " '[i]t is necessary to commence with the first subsection and then to descend in numerical order under the other subsections until the wage rate provision is found that applies to the particular facts of the case.' " *Stegeman*, 611 S.W.2d at 210 (quoting *Glazebrook v. Hazelwood School Dist.*, 498 S.W.2d 823, 826 (Mo.App. 1973)). As such, in that this Court has already found the Commission was correct in calculating Claimant's TTD per section 287.250.1(4) because his wages "were fixed ... by the output of the employee," we need not explore Claimant's argument that his wages should have been calculated under the formulae set out in section 287.250.4 pertaining to situations where "the average weekly wage cannot fairly and justly be determined by the formulas provided in subsections 1 to 3 of this section...."

Therefore, the Commission's calculation under section 287.250.1(4) that Claimant's average weekly wage for the purposes of TTD compensation was $595.30 was not in error, was supported by substantial and competent evidence and was not against the weight of the evidence. *Hampton*, 121 S.W.3d at 222. Point denied.

Claimant's second point relied on asserts the Commission erred in determining "the

---

7. The Commission also determined, based on its calculations, that Claimant received an underpayment of his TTD compensation. It found that Claimant had been paid

[TTD] compensation in the amount of $7,728.50, payable for the period of March 14, 2003, through July 28, 2003 (137 days or 19 and 4/7 weeks). Yet, for this period of [TTD], in recognizing an applicable compensation rate of $396.87 per week, [Claimant] was entitled to $7,767.90. ($396.87 divided by 7 = $56.70 per day / $56.70 multiplied by 137 days = $7,767.90.) Therefore, [Claimant] received an underpayment of [TTD] compensation, and is entitled to additional [TTD] in the amount of $39.40.

8. *See also Zeitner v. Floair, Inc.*, 211 Kan. 19, 505 P.2d 661, 664 (1973) (holding that an employee, who was contractually hired to receive "seven cents per nautical mile flown," had "his wages fixed 'by the output of the employee' "); *Clifford v. Harchelroad Chevrolet, Inc.*, 229 Neb. 78, 425 N.W.2d 331, 332-33 (1988) (holding the wages of "a commission salesman of new and used motor vehicles, farm machinery, and farm equipment" should be calculated by "the output of the employee...."); *Hwy. Freight Co. v. Workmen's Comp. Bureau*, 125 N.J.L. 168, 15 A.2d 272, 273 (1940) (holding the wages of a truck driver who was "paid by the trip" were "fixed by the output of the employee").

nature and extent of [Claimant's] disability based upon the [ALJ's] personal knowledge and observations, in that the overwhelming weight of expert medical and vocational testimony conclusively evidenced that [Claimant] was permanently and totally disabled."[9]

■ Here, the Commission found Claimant "is not believable and, unfortunately presents with a history of being less than truthful." In support of its credibility determination, the Commission noted that Claimant's activities after the accident "and his appearance at the hearing, suggest that he is not severely disabled...." The Commission also observed in its findings that at the hearing Claimant appeared to be "a slender and well-tanned individual who exhibits a normal gait and healthy appearance. He was capable of being actively engaged in the trial process, taking notes, and listening to the testimonies and conversations without any noticeable difficulty."

It has long been held that the Commission is the judge of the credibility of witnesses and the weight of their testimony. *See Shaw*, 49 S.W.3d at 728. While the Commission " 'may not base [its] finding upon conjecture or their own mere personal opinion unsupported by sufficient competent evidence,' " *Houston v. Roadway Express, Inc.*, 133 S.W.3d 173, 179–80 (Mo. App.2004) (quoting *Corp v. Joplin Cement Co.*, 337 S.W.2d 252, 258 (Mo. banc 1960)), in the present matter the Commission's observations relating to Claimant's appearance at the hearing and its ultimate finding that he was not permanently and totally disabled were supported by sufficient competent evidence as well as expert testimony and medical opinion.[10]

■ It has long been held that " '[t]he fact finder may reject all or part of an expert's testimony.' " *Russell v. Invensys Cooking & Refrigeration*, 174 S.W.3d 15, 23 (Mo.App.2005) (quoting *Bennett v. Columbia Hlth. Care*, 134 S.W.3d 84, 92 (Mo.App.2004)). "We will uphold the Commission's 'decision to accept one of two conflicting medical opinions' if such a finding is supported by competent and substantial evidence." *Russell*, 174 S.W.3d at 23 (quoting *Birdsong v. Waste Mgmt.*, 147 S.W.3d 132, 137 (Mo.App.2004)). "When witnesses are deposed and do not testify live before the ALJ, the Commission is just as able as the ALJ to determine credibility from the written record." *Birdsong*, 147 S.W.3d at 137–38. " 'We will not overturn the Commission's determination regarding conflicting medical opinions, unless it is against the overwhelming weight of the evidence.' " *Russell*, 174 S.W.3d at 23 (quoting *Bennett*, 134 S.W.3d at 92).

Here, the Commission noted that the parties involved

offer differing medical opinions relative to the nature and extent of [Claimant's] permanent disability. [Claimant] as-

9. "The test for permanent total disability is the claimant's ability to compete in the open labor market." *Forshee v. Landmark Excavating and Equip.*, 165 S.W.3d 533, 537 (Mo. App.2005). "The critical question is whether an employer could reasonably be expected to hire the claimant, considering his present physical condition, and reasonably expect him to successfully perform the work." *Id.*

10. We note that in his appellate brief Claimant states the Commission concluded he "did not have a hearing deficiency because ... [he] was 'actively engaged in the trial process....'" The Commission made no such finding relating to Claimant's hearing loss. Additionally, while the Commission referred to Claimant's healthy appearance at the hearing, it is clear that its determination that Claimant was not permanently and totally disabled was chiefly based on the medical and expert testimony presented.

serts that he is permanently and totally disabled, and relies upon the medical opinion of Dr. Belz and the vocational opinion of Mr. Swearingin. [Employer] ..., as well as the Second Injury Fund, dispute the contentions of [Claimant], asserting that he is not permanently and totally disabled ... [and] rely upon the medical opinion of Dr. Jordan, together with other evidence impeaching the testimony and credibility of [Claimant].

After its review of the aforementioned evidence, the Commission determined that based on the medical evidence it was "persuaded that [Claimant] is not nearly as limited or restricted in his activities as he suggests, or as Dr. Belz suggest[s]...." The Commission found that Dr. Belz's opinions were "premised significantly on his acceptance as true the complaints of pain, limitations, and history provided to him by [Claimant]" due to the fact that "none of the treating or examining physicians objectively quantified these subjective complaints of pain and self-imposed limitations." The Commission resolved the differences in the medical opinions "in favor of Dr. Jordan."

■ Dr. Jordan noted in his diagnostic notes that Claimant reported "he can sit and walk in yard;" he can ride his lawn mower and water his garden; and he " 'builds bird houses.' " Dr. Jordan found nothing physically wrong with Claimant which would require Claimant to lie down every four hours although Claimant insisted he had to do so. Dr. Jordan stated that Claimant had fully recovered from his femoral hernia and suffered no disability as a result of that surgery. Further, after viewing the surveillance tape of Claimant carrying large stones in each hand while building a garden wall during the period of time in which Dr. Jordan was treating him for chronic back pain, Dr. Jordan found Claimant's actions to be inconsistent with the ailments and complaints Claimant had

reported to him. In fact, Dr. Jordan stated that as a result of viewing the videotape, he was inclined to lower the disability ratings he had given Claimant in his report. It was within the Commission's province to reject the expert medical opinion of Dr. Belz and accept the expert medical opinion of Dr. Jordan when supported by competent and substantial evidence. *Russell*, 174 S.W.3d at 23.

Here, the Commission, as detailed above, specifically found Claimant was not credible. As previously recited, in making that determination the Commission referenced Claimant's own testimony that he was able to garden and tend to his yard, as evidenced by the surveillance tape; that he was able to take care of his home and perform personal tasks such as doing his laundry; and had been deer hunting since his accident. Additionally, the Commission noted Claimant's failure to advise Dr. Curry on March 6, 2003, about his accident of February 17, 2003, and also failed to relate any of his symptoms or complaints of pain in his lower back to Dr. Curry at that time. The Commission found Claimant's complaints of pain and disability were inconsistent with the activities he performed on a daily basis. The Commission judged the weight and credibility of Claimant's testimony and we do not " 'substitute [our] judgment for that of the Commission.' " *Royal v. Advantica Rest. Group, Inc.*, 194 S.W.3d 371, 373 (Mo.App.2006) (quoting *Merriman v. Ben Gutman Truck Serv., Inc.*, 392 S.W.2d 292, 296 (Mo.1965)).

Additionally, the Commission's decision to defer to the findings of Dr. Jordan as opposed to the medical opinion of Dr. Belz was not an abuse of discretion and was within its province. *Bennett*, 134 S.W.3d at 92.

■ The deposition testimony and medical evidence of Dr. Jordan coupled with the Commission's determination that

Claimant was not credible constituted substantial, competent and credible evidence that Claimant was not permanently and totally disabled as a result of his work related accident. The Commission's "finding is not against the overwhelming weight of the evidence in the record." *Minies v. Meadowbrook Manor*, 105 S.W.3d 529, 538 (Mo.App.2003). Claimant's second point is denied.

The Final Award of the Commission is affirmed.

BATES, C.J., and LYNCH, J., concur.